KURT A. KAPPES – SBN 146384
kappesk@gtlaw.com
MICHAEL D. LANE – SBN 239517
lanemd@gtlaw.com
SEAN A. NEWLAND – SBN 300928
newlands@gtlaw.com
GREENBERG TRAURIG, LLP
1201 K Street, Suite 1100
Sacramento, CA  95814-3938
Telephone:  (916) 442-1111
Facsimile:  (916) 448-1709

Attorneys for Plaintiff
ROADRUNNER INTERMODAL SERVICES,
LLC

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROADRUNNER INTERMODAL SERVICES, LLC, a Delaware limited liability company, <br><br> Plaintiff, <br><br> v. <br><br> T.G.S. TRANSPORTATION, INC., a California corporation, and DOES 1-10, <br><br> Defendants. | CASE NO.  1:17-CV-01056-DAD-BAM <br><br> **PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION** <br><br> [Filed concurrently with: <br> 1. Notice of Motion and Motion; <br> 2. Declaration of Ben Kirkland; <br> 3. Declaration of Mark Avila; <br> 4. Declaration of Michael D. Lane; and <br> 5. [Proposed] Preliminary Injunction] <br><br> Hearing: <br> Date:   November 7, 2017 <br> Time:  9:30 a.m. <br> Courtroom:  Courtroom 5, Seventh Floor |

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................. 1

II.     FACTUAL BACKGROUND ............................................................................... 2

        A.      As Part of Cox's Sale of His Business to Roadrunner, Roadrunner and Cox Enter
                Into a Valid and Enforceable Stock Purchase Agreement, Including  Non-
                Competition, Non-Solicitation and Non-Disclosure Provisions That Were
                "Necessary" to Protect the Goodwill of the Entities Roadrunner Purchased ................... 2

        B.      TGS Competes with Roadrunner, Central Cal, and Double C in the Business of
                International Trucking, and TGS's Principals Have Maintained Personal
                Relationships with Cox for Over 30 Years ................................................................ 5

        C.      Cox                                                                                                   
                        After Cox Leaves Roadrunner, and                                                              
                ............................................................................................................. 5

        D.      TGS                                                                                                   
                ............................................................................................................. 6

        E.      Throughout the Month of June 2017, TGS Plots with Cox to Covertly Violate the
                SPA's Non-Compete Provisions .................................................................................. 6

                1.      Cox's Discloses Roadrunner's Confidential Information to TGS                                    
                        ..................................................................................................... 6

                2.      TGS's and Cox's Early June 2017 Efforts to Solicit Roadrunner's
                        Employees ............................................................................................ 7

                3.      TGS's and Cox's Early June 2017 Efforts to Solicit Roadrunner's
                        Customers ............................................................................................ 7

                4.      TGS's and Cox's Calculated Risk to Hire Cox and Interfere with the SPA
                        Six Months Before the Expiration of the SPA/Non-Compete ............................... 8

        F.      TGS Treats                                                                                            
                ..................................................................................................... 8

        G.      TGS and Cox Concede That                                                                              
                ..................................................................................................... 8

        H.      Roadrunner Sends Cease and Desist Letter to TGS After Learning that TGS Hired
                Cox, but TGS Continues Violating the SPA's Non-Compete Provisions ......................... 9

        I.      TGS and Cox's SPA Violations Cause Roadrunner to Suffer Significant Harm ............. 10

III.   LEGAL STANDARD ................................................................................................ 10

IV.   ARGUMENT ...................................................................................................... 11

    A.   Roadrunner Will Succeed on the Merits of Multiple Claims ................................... 11

        1.   The Evidence Overwhelmingly Supports Finding That TGS Tortiously
            Interfered with the SPA .................................................................... 11

            a.   The Validity and Enforceability of the SPA Is Governed By
                Delaware Law, and Under Delaware Law, the SPA Is Valid and
                Enforceable Against Cox ........................................................... 12

            b.   Similarly, the SPA Is Clearly Enforceable Under California Law ........... 13

            c.   TGS Knew of the SPA and its Non-Compete Provisions Yet
                Conspired With Cox to Perform Acts Intended to Breach and
                Disrupt the SPA ....................................................................... 15

            d.   TGS Successfully Caused Cox to Breach and Thereby Disrupted
                the SPA, and Its Interference Has Inflicted and Continues to Inflict
                Serious, Irreparable Harm On Roadrunner ................................... 16

        2.   The Evidence Demonstrates That TGS Tortiously Interfered with
             Roadrunner's Prospective Economic Relations ..................................... 17

        3.   The Evidence Demonstrates That TGS Converted Roadrunner's Property .......... 18

    B.   Roadrunner Will Continue to Suffer Substantial, Egregious and Irreparable Harm
        Without an Injunction .................................................................... 19

    C.   The Enormous, Irreparable Harm to Roadrunner Outweighs Any Inconvenience to
        TGS ........................................................................................ 22

    D.   The Public Interest Favors an Injunction ............................................. 24

    E.   Bond ........................................................................................ 24

V.   HEARING REQUESTED ...................................................................................... 25

VI.   CONCLUSION .................................................................................................. 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alexander & Alexander Ben. Services, Inc. v. Benefit Brokers & Consultants, Inc.*,
  756 F. Supp. 1408 (D. Or. 1991) ...................................................................................21

*Alliance for the Wild Rockies v. Cottrell*,
  632 F.3d 1127 (9th Cir. 2011) .......................................................................................11

*Alliant Ins. Services, Inc. v. Gaddy*,
  159 Cal. App. 4th 1292 (2008) ......................................................................................15

*Allied N. Am. Ins. Brokerage Corp. v. Woodruff-Sawyer*,
  2005 U.S. Dist. LEXIS 47388 (N.D. Cal. Feb. 19, 2005) ............................................21

*Atlanta Sch. of Kayaking, Inc. v. Douglasville-Douglas Cty. Water and Sewer Auth.*,
  981 F. Supp. 1467 (N.D. Ga. 1997) ..............................................................................11

*Baiul v. NBC Sports*,
  2016 U.S. Dist. LEXIS 13021 (C.D. Cal. Feb. 2, 2016).................................................18

*Beltz v. Wells Fargo Home Mortg.*,
  2017 U.S. Dist. LEXIS 29140 (E.D. Cal. Feb. 27, 2017)...............................................24

*Brace Indus. Contr., Inc. v. Peterson Enters.*,
  2016 Del. Ch. LEXIS 163 (Del. Ch. Oct. 31, 2016).....................................................12

*Cenveo Corp. v. Diversapack LLC*,
  2009 U.S. Dist. LEXIS 91535 (S.D.N.Y. Oct. 1, 2009) ...............................................20

*Converdyn v. Moniz*,
  68 F. Supp. 3d 34 (D.D.C. Sept. 12, 2014) ..................................................................20

*Diamond Blade Warehouse, Inc. v. Paramount Diamond Tools, Inc.*
  420 F. Supp. 2d 866 (N.D. Ill. 2006) ............................................................................20

*Dr. Seuss Enters. v. Penguin Books USA, Inc.*,
  109 F.3d 1394 (9th Cir. 1997) .......................................................................................11

*Farmers Ins. Exch. v. Steele Ins. Agency, Inc.*,
  2013 U.S. Dist. LEXIS 70098 (E.D. Cal. May 16, 2013)...............................................21

*Farmers Ins. Exchange v. Zerin*,
  53 Cal. App. 4th 445 (1997) ..........................................................................................18

*Farris v. Seabrook*,
  677 F.3d 858 (9th Cir. 2012) .........................................................................................11

*Fremont Indem. Co. v. Fremont Gen. Corp.*,
  148 Cal. App. 4th 97 (2007) ..........................................................................................19

*Global Switching Inc. v. Kasper*,
  2006 U.S. Dist. LEXIS 44450 (E.D.N.Y. June 29, 2006) .............................................20

*Herb Reed Enters., LLC v. Florida Entm't Mgmt., Inc.*,
736 F.3d 1239 (9th Cir. 2012) ....................................................................20

*Hough Assocs. v. Hill*,
2007 Del Ch. LEXIS 5 (Del. Ch. Jan. 17, 2007) ...............................12, 13

*IHOP Franchising, LLC v. Hameed*,
2015 U.S. Dist. LEXIS 12021 (E.D. Cal. Jan. 30, 2015)...............................23

*Johnson v. Couturier*,
572 F.3d 1067 (9th Cir. 2009) ...............................................................11, 25

*Jorgensen v. Cassiday*,
320 F.3d 906 (9th Cir. 2003) ....................................................................25

*Kan Di Ki, LLC v. Suer*,
2015 Del. Ch. LEXIS 191 (Del Ch. July 22, 2015) ........................................13

*Korea Supply Co. v. Lockheed Martin Corp.*,
29 Cal. 4th 1134 (2003) ............................................................................18

*League of Wilderness Defenders/Blue Mountain Biodiversity Project*,
752 F.3d 755 (9th Cir. 2014) ....................................................................23

*LGS Architects, Inc. v. Concordia Homes of Nev.*,
434 F.3d 1150 (9th Cir. 2006) ....................................................................10

*Lillge v. Verity*,
2007 U.S. Dist. LEXIS 73543 (N.D. Cal. Oct. 2, 2007)........................21, 22

*Los Angeles Mem'l Coliseum Comm'n*,
634 F.2d 1197 (9th Cir. 1980) ....................................................................20

*M-I LLC v. Argus Green LLC*,
2010 WL 11527419 (E.D. Tex. July 13, 2010), *report and recommendation adopted*,
2010 WL 11527418 (E.D. Tex. Aug. 26, 2010) ...........................................12

*Marsh USA Inc. v. Karasaki*,
2008 U.S. Dist. LEXIS 90986 (S.D.N.Y. Oct. 30, 2008) ..............................21

*Monogram Industries, Inc. v. Sar Industries, Inc.*,
64 Cal. App. 3d 692 (1976) ...............................................................14, 15

*MySpace, Inc. v. Wallace*,
498 F. Supp. 2d 1293 (C.D. Cal. 2007) ........................................................22

*O'Leary v. Telecom Res. Serv., LLC*,
2011 Del. Super. LEXIS 36 (Del. Super. Jan. 14, 2011) ...............................13

*Oracle Am., Inc. v. Cedarcrestone, Inc.*,
2013 U.S. Dist. 89986 (N.D. Cal. June 26, 2013) ......................................18

*People Experts CA, Inc. v. Engstrom*,
2017 U.S. Dist. LEXIS 154524 (E.D. Cal. Sept. 21, 2017)............................11

*PolyPortables LLC v. Endurequest Corp.*,
2016 U.S. Dist. LEXIS 149986 (E.D. Cal. Sept. 13, 2017)........................11, 20

MPA I/S/O MOTION FOR PRELIMINARY INJUNCTION

*Quelimane Co. v. Stewart Title Guar. Co.*,
  19 Cal. 4th 26 (1998) ............................................................................................................12

*Roth v. Rhodes*,
  25 Cal. App. 4th 530 (1994) ...................................................................................................18

*Stuhlbarg Int'l Sales Co. v. John D. Brush and Co., Inc.*,
  240 F.3d 832 (9th Cir. 2001) ..................................................................................................22

*Sybersound Records, Inc. v. UAV Corp.*,
  517 F.3d 1137 (9th Cir. 2008) ................................................................................................18

*Terex Corp. v. Cubex, Ltd.*,
  2006 U.S. Dist. LEXIS 88863 (N.D. Tex. Dec. 7, 2006) .......................................................20

*TMX Funding, Inc. v. Impero Techs., Inc.*,
  2010 U.S. Dist. LEXIS 37064 (N.D. Cal. Mar. 18, 2010) ......................................................22

*Tull v. Turek*,
  38 Del. Ch. 182, 147 A.2d 658 (Del. 1958) ...........................................................................13

*United States Legal Support, Inc. v. Hofioni*,
  2013 U.S. Dist. LEXIS 179282 (E.D. Cal. Dec. 19, 2013) ....................................................19

*Vacco Industries, Inc. v. Van Den Berg*,
  5 Cal. App. 4th 34 (1992) .......................................................................................................15

*Winter v. Natural Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ..............................................................................................................11, 23

*Wyndham Resort Dev. Corp. v. Bingham*,
  2010 U.S. Dist. LEXIS 80608 (E.D. Cal. July 8, 2010) ............................................10, 21, 22

**Statutes**

Cal. Bus. & Prof. Code § 16600 .................................................................................................15

Cal. Bus. & Prof. Code § 16601 ...........................................................................................14, 15

**Other Authorities**

Fed. R. Civ. P. 65(c) ...................................................................................................................25

Local Rule 231(d)(3) ...................................................................................................................25

Paul M. Crimmins, *Earn-outs in M&A Transactions: Key Structures and Recent
  Developments*, 10 THE M&A JOURNAL, no. 10 .......................................................................15

MPA I/S/O MOTION FOR PRELIMINARY INJUNCTION

# I.   **INTRODUCTION**

Injunctive relief is desperately needed here to stop the significant, ongoing harm Defendant T.G.S. Transportation Inc. ("TGS") is inflicting on Plaintiff Roadrunner Intermodal Services, LLC ("Roadrunner"), to preserve what remains of Roadrunner's Central Cal Transportation trucking business ("Central Cal") during the pendency of this action, and to halt TGS's brazen solicitation of Roadrunner's customers, employees, and truck drivers.

Almost five years ago, in November 2012, Roadrunner, looking to expand its trucking business into California's lucrative almond and dried fruit market, purchased all of the outstanding capital stock of Jeffrey Cox's ("Cox") company, Central Cal. Central Cal came with an established business and goodwill, including long-standing customer and employee relationships. To protect the value of that goodwill, Roadrunner and Cox agreed to a non-competition, non-solicitation and confidentiality agreement that would expire on December 31, 2017.

On May 31, 2017, four and a half years after Roadrunner purchased Central Cal, Roadrunner and Cox parted ways.

Case No.    1:17-cv-01056-DAD-BAM

MPA I/S/O MOTION FOR PRELIMINARY INJUNCTION

The impact has been and continues to be staggering.  By mid-August, TGS, was able to successfully solicit five of Roadrunner's employees and twenty of Roadrunner's drivers to TGS.  In addition, TGS and Cox successfully solicited three of Roadrunner's customers. And TGS and Cox, show absolutely no signs of slowing down their raids on Roadrunner's valuable assets.

Roadrunner will assuredly succeed on the merits of its tortious interference and conversion claims because and hiring Cox alone violates the agreement's lawful restriction on Cox's ability to take a competing employment position for a defined period of time.  (Of course, hiring Cox was just TGS's opening move in its plan to use Cox and Cox's accumulated knowledge of Roadrunner's confidential information to take Roadrunner's business.)

Further, only injunctive relief can properly address and protect Roadrunner from the irreparable harm Roadrunner will continue to suffer if TGS continues raiding Roadrunner's customers, employees, and drivers in violation of the bargained for agreement between Roadrunner and Cox.  Roadrunner's plight is particularly dire at this time of year, as California enters in to the almond harvest season.

Conversely, TGS will suffer minimal hardship from temporary injunctive relief, particularly compared to the harm that Roadrunner has and will continue to suffer absent such relief.

Accordingly, Roadrunner requests an order preliminarily enjoining TGS's interference activities to preserve the status quo during this case.

## II.    FACTUAL BACKGROUND

**A.    As Part of Cox's Sale of His Business to Roadrunner, Roadrunner and Cox Enter Into a Valid and Enforceable Stock Purchase Agreement, Including Non-Competition, Non-Solicitation and Non-Disclosure Provisions That Were "Necessary" to Protect the Goodwill of the Entities Roadrunner Purchased**

On November 2, 2012, Roadrunner entered into a "Stock Purchase Agreement" ("SPA") with Central Cal Transportation ("Central Cal"), Double C Transportation ("Double C"), and Central Cal and

MPA I/S/O MOTION FOR PRELIMINARY INJUNCTION

Double C's owners, Cox and Cox's former partner, David Chidester, under which Roadrunner agreed to purchase Central Cal and Double C's capital stock.  *See* Declaration of Ben Kirkland ("Kirkland Decl."), ¶¶3-4, Exhs. 1,2 (citations hereafter to the SPA); Declaration of Michael D. Lane ("Lane Decl."), Exh. D (Deposition of Jeffrey Cox, dated September 29, 2017) ("Cox Depo.") at 12:22-25, 13-18.[1]

Central Cal and Double C's business was providing "international" trucking, or intermodal transportation services, to a variety of local, national, and international customers.  Lane Decl., Exh. C (Deposition of TGS, Volume 3) ("TGS Vol. 3") at 393:22-394:2; Cox Depo. at 50:7-11.

As payment for the shares and Central Cal's and Double C's assets—which expressly included their goodwill[2]—Roadrunner agreed to pay $3,850,000 less debt at closing and plus or minus available cash, depending on the balance at closing (defined in the SPA as the "Purchase Price").  SPA §§ 1.2, 3.15, 7.4(a)(i) and 7.4(c).[3]

The SPA also includes a "Non-Competition, Non-Solicitation and Non-Disclosure" ("Non-Compete") provision under which Cox agreed, "[i]n consideration of the payment of the *Purchase Price*" (emphasis added), not to engage in certain conduct from the date of the closing until December 31, 2017 ("Restricted Period").  *See generally* SPA §§ 7.4(a)-(c).  The provisions of the Non-Compete include the following:

- **Section 7.4(a)(i)(B):** Cox cannot work for or with, in any way, any entity that is either engaged in or planning to engage in any facet of Central Cal's businesses, or that competes or is planning to compete with Roadrunner in any way (the "Competing Employment" provision).

- **Section 7.4(a)(i)(C):** Cox cannot use his knowledge of Central Cal's business and/or his relationships with its customers or other persons connected to it to compete with Roadrunner in any facet of Central Cal's businesses (the "Central Cal Knowledge"

---

[1] Following the execution of the SPA Roadrunner merged Central Cal and Double C into a single one entity.  Each entity is hereafter referred to as "Central Cal."
[2] Of particular import is § 7.4(c), in which Cox acknowledged and agreed that he entered into the Non-Complete "in connection with [his] sale … of the goodwill" of Central Cal's business.
[3] "Additional consideration" in the form of incentive payments ("Earn-Out" payments) is also provided for in the SPA, which, while not a component of the Purchase Price, were payable to Cox if Central Cal achieved performance goals in the preceding calendar years.  SPA § 1.7.

provision).

- **Section 7.4(a)(ii)(B)-(D):** Cox cannot (1) contact actual or targeted customers of Central Cal regarding any facet of its business or disclose or use any information that in any way relates to Central Cal's trade or business relationships; (2) try to induce employees or agents of Central Cal to leave it or to otherwise stop performing services for it, Roadrunner, or affiliates thereof, or interfere in any other way with the relationship between Central Cal and its employees or agents; or (3) disparage Central Cal, Roadrunner, or their affiliates or otherwise engage in conduct that is injurious to Central Cal's reputation or interests (the "Non-Solicitation" provision).

- **Section 7.4(a)(iii):** Cox cannot divulge, communicate, use to Central Cal's detriment or for the benefit of any other company, or misuse in any manner Central Cal's or its affiliates' confidential or trade secret information and instead must receive and hold such information in trust and strict confidence, take steps to protect it from disclosure and prevent it from losing its general character as confidential or trade secret information, and not use, disseminate, or disclose such information, directly or indirectly, to third parties (the "Confidentiality" provision).

- **Section 7.4(b) Injunction:** Cox recognized and acknowledged that his breach of Section 7.4(a) "may cause irreparable harm and damage" to Roadrunner "in a monetary amount that may be virtually impossible to ascertain," and as a result, that Roadrunner "shall be entitled to an injunction from any court of competent jurisdiction enjoining and restraining any breach or violation of any or all of the covenants set forth in Section 7.4(a)."

- **Section 7.4(c):** Cox's acknowledgement that he had consulted legal counsel regarding the [Non-Compete] and based on such consultation ha[d] determined and … acknowledge[d] that the [covenants in the Non-Compete] are reasonable in terms of duration, scope, and area … and are necessary to protect the legitimate, protectable interests of [Central Cal], the goodwill of [Central Cal] and [its] Affiliates (including Roadrunner) and the substantial investment in [Central Cal] made by [Roadrunner] pursuant to th[e] [SPA]."

1    Most notably, the SPA also included, as Exhibit A, a legal opinion from Cox's counsel, Baker,

2  Manock & Jensen, opining that the SPA was the legal, valid and binding obligations of Central Cal and

3  Cox, enforceable against them both according to its terms.   Kirkland Decl., ¶ 4, Exh. 2; Cox Depo. at

4  85:14-87:18.

5    **B.    TGS Competes with Roadrunner, Central Cal, and Double C in the Business of**

6  **International Trucking, and TGS's Principals Have Maintained Personal**
   **Relationships with Cox for Over 30 Years**

7    TGS competed with Central Cal and Roadrunner (after Roadrunner purchased Central Cal)

8  TGS Vol. 3 at 393:22-394:2; Cox Depo. at 55:3-18, 49:23-50:11.

9    Peter Schneider, TGS's former Vice President and current Executive Vice President, and

10  Timothy Schneider, TGS's President,[4]

11    *See* Lane Decl., Exh. A (Deposition of TGS, Volume 1) ("TGS Vol. 1") at 9:22-10:13, 21:7-

12  19; Cox Depo. at 48:17-22.

13    TGS

14  Vol. 1 at 21:7-19; Cox Depo. at 48:17-22.

15

16

17    *Id.* at 43:22-44:4, 89:14-25.[5]

18    **C.    Cox**

19  **After Cox Leaves Roadrunner, and**

20    During Cox's employment at Roadrunner.

21

22  Cox Depo. at 71:9-73:6, 165:22-166:2

23    When Cox left Roadrunner at the end of May 2017.

24

25    *Id.*

26

---

27  [4] Messrs. Schneider are referred to in this motion by their first names in order to avoid confusion.

28  [5] As it happens, Cox was in Peter and Timothy's office, his mentors, when the transaction closed.  *See* TGS Vol. 1 at 39:20-23.

**D.    TGS**

No later than the *morning after* Cox's final day with Roadrunner on June 1, 2017,

*See id.* at 17:6-10, 19:1-20; Cox Depo at 88:9-21.

Cox Depo. at 35:21-25; Lane Decl., Exh. B (Deposition of TGS Volume 2) ("TGS Vol. 2") at 189:19-193:4; TGS Vol. 1 at 127:5-131:8.

TGS Vol. 3 at 365:16-22.

**E.    Throughout the Month of June 2017, TGS Plots with Cox to Covertly Violate the SPA's Non-Compete Provisions**

**1.    Cox's Discloses Roadrunner's Confidential Information to TGS**

TGS's and Cox's concerted efforts throughout the month of June 2017 to hire away Roadrunner's employees and drivers, and to solicit business from Roadrunner's customers, began in earnest no later than                                    Lane Decl., Exh. F.

As noted,

TGS Vol. 1 at 128:13-131:8, Lane Decl., Exh. F. as well. *Id.*

Indeed, next to

TGS Vol. 1 at 128:13-25; Lane Decl., Exh. F.

Cox also

TGS Vol. 1 at 127:25-128:12; Lane Decl., Exh. F.

Following                         Cox and TGS planned

Lane Decl.,

Exh. E at TGS 241, 310-311; TGS Vol. 1 at 142:14-144:25.  *See* TGS Vol. 1 at 128:13-131:8; Lane

Decl., Exh. F.

All told, Peter testified that

TGS Vol. 1 at 35:7-9.

>    **2.**   **TGS's and Cox's Early June 2017 Efforts to Solicit Roadrunner's Employees**

Until June 2017,                                              TGS Vol. 1 at

88:25-89:1                                   Yet by early July, TGS had hired

four Roadrunner employees:  Grace Castaneda, Ashley Grijalva, Jose Avalos, and Chris Rodriguez.

TGS Vol. 1 at 174:9-25.  In every case,

TGS Vol. 1 at 175:1-17 (Rodriguez); TGS

Vol. 2 at 193:15-20 (Castaneda); Lane Decl., Exh. E at TGS 248-249 (

, 254-55 (Rodriguez), 259 (Grijalva), 322-323 (Castaneda).

In furtherance of TGS's solicitation efforts, Cox personally contacted Grace Castaneda and Chris

Rodriguez on Castaneda and Rodriguez's Roadrunner company cell phones—while Castaneda and

Rodriguez were still employed at Roadrunner.  Kirkland Decl., ¶¶5-9, Exh. 3.  More specifically, Cox

contacted Castaneda 23 times between June 17 and July 10, and contacted Rodriguez 22 times between

June 12 and June 29.  *Id.*; *see also* TGS Vol. 2 at 301:8-302:5, Lane Decl., Exh. E at TGS 315

In addition, TGS also contacted and unsuccessfully attempted to hire two other Roadrunner

employees in June and early July, Mark Avila and Natalie Pierce.

TGS Vol. 1 at 110:2-

8; Lane Decl., Exh. E at TGS 244-245, 314 (Avila), 322-323 (Pierce).

>    **3.**   **TGS's and Cox's Early June 2017 Efforts to Solicit Roadrunner's Customers**

1    TGS also used

2                     to contact Roadrunner's customers                          Lane Decl.,

3  Exh. E at TGS 242 (Expeditors), 248-249                  315 (Sierra Valley), 317 (Minturn and

4  Sierra Valley), 318, 351

5    Once again,

6

7  *Id.*; Cox Depo. at 62:8-15, 62:23-63:4, 66:2-5, 67:19-25, 68:15-18; TGS Vol. 1 at 115:20-116:3, 147:10-15.

8          **4.    TGS's and Cox's Calculated Risk to Hire Cox and Interfere with the SPA Six**
9              **Months Before the Expiration of the SPA/Non-Compete**

     TGS's original plan
10
                                 TGS Vol. 3 at 360:19-361:2, 363:12-23.  However, at some point
11

12

13
                                 TGS Vol. 3 at 364:19-365:14, 367:15-370:11, Lane
14

   Decl., Exh. E at 310-311.
15

16    **F.    TGS Treats**

17

18    The reason Cox was subject to restrictive covenants is because much of the information in this

   industry is proprietary.  Indeed,
19
                                 TGS Vol. 2 at 212:23-213:4
20
               . 282:3-283:14                              : Cox Depo. at 175:11-14.  Moreover,
21

22

23
          TGS Vol. 2 at 238:24-239:19, TGS Vol. 3 at 399:9-14; 400:8-21.
24

25    **G.    TGS and Cox Concede That**

26

   TGS and Cox conceded during deposition that
27

28

Cox Depo. at 52:17-55:16, 172:13-175:14;[6] TGS Vol. 1 at 61:14-20.

During Cox's time at Roadrunner/Central Cal, Cox

Cox Depo. 29:12-17.

**H.**  **Roadrunner Sends Cease and Desist Letter to TGS After Learning that TGS Hired Cox, but TGS Continues Violating the SPA's Non-Compete Provisions**

TGS                                          and has refused to slow down its efforts to solicit Roadrunner's customers, employees, and drivers.  TGS Vol. 3 at 225:10-226:22.

On

TGS Vol. 2 at 273:25-274:16; TGS Vol. 3 at 321:16-322:8, 323:9-11; Lane Decl.. Exh. E at TGS 328.

TGS Vol. 2 at 276:13-22.

On July 11, 2017, after learning that TGS hired Cox, Roadrunner's counsel sent a letter TGS, Tim, and Peter, which addressed Cox's violations of the Non-Compete and demanded that TGS cease its interference with Roadrunner's contractual relationship with Cox.  Lane Decl., Exh. G.

TGS's counsel responded on July 17, 2017, and failed to confirm that Cox will not be an employee of TGS.  Lane Decl., Exh. H.

Indeed, if anything, TGS's                    and solicitation of Roadrunner's employees increased.

---

[6] Roadrunner may seek leave of Court to amend the Complaint to allege a claim for relief under the DTSA.

For example, just recently in August 2017, TGS hired Roadrunner employee Greg White after discussing his potential employment with Cox, and Peter texted and attempted to solicit Roadrunner employee Oscar Melendez at Mr. Melendez's Roadrunner-issued company cell phone.  TGS Vol. 1 at 174:17-25; TGS Vol. 2 at 203:23-205:1; TGS 343-5 (White); Kirkland Decl. ¶9, Exh. 4.

Further, between July and August 2017, Roadrunner lost the business of Minturn Nut, Sierra Valley Almond, and Expeditors to TGS,                                                            Lane Decl., Exh. E at TGS 242,309-311 (Expeditors), TGS 315 (Sierra Valley), 317 (Minturn and Sierra Valley), 318,351            TGS Vol. 2 at 279:14-21,292:21-293:7;TGS Vol. 3 at 406:10-19; Kirkland Decl., ¶¶11-12.

## I.      TGS and Cox's SPA Violations Cause Roadrunner to Suffer Significant Harm

From June 1, 2017 until present, Roadrunner has lost three customers, millions of dollars in lost revenue per year, five employees, and 20 drivers to TGS—and that is only a fraction of the known Roadrunner customers, employees, and drivers TGS and Cox have solicited.  Kirkland Decl., ¶¶11-12.

## III.   LEGAL STANDARD

Preliminary injunctions "preserve[s] the relative positions of the parties – the status quo – until a trial on the merits can be conducted."  *Wyndham Resort Dev. Corp. v. Bingham*, 2010 U.S. Dist. LEXIS 80608, at *2 (E.D. Cal. July 8, 2010) (citing *LGS Architects, Inc. v. Concordia Homes of Nev.*, 434 F.3d 1150, 1158 (9th Cir. 2006)).  To receive preliminary relief, a party must show: "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

The Ninth Circuit has "articulated an alternate formulation of the *Winter* test" as well; the "serious questions" approach.  *Farris v. Seabrook*, 677 F.3d 858, 864 (9th Cir. 2012).  Under that approach, "'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest. *Alliance for the Wild Rockies v. Cottrell,* 632 F.3d 1127, 1135 (9th Cir. 2011); *see also PolyPortables LLC v. Endurequest Corp.*, 2016 U.S. Dist. LEXIS 149986, at *6-7 n.1 (E.D. Cal. Sept. 13, 2017) ("[T]his

'serious question' version of the circuit's sliding scale approach survives 'when applied as part of the four-element *Winter* test.") (quoting *Alliance*).

In ruling on a preliminary injunction motion, "the court may rely on declarations, affidavits and exhibits, among other things," *People Experts CA, Inc. v. Engstrom*, 2017 U.S. Dist. LEXIS 154524, at *13 (E.D. Cal. Sept. 21, 2017) (citations omitted), and on inadmissible evidence like hearsay. *Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009). "Such evidence need not conform to the standards for a summary judgment motion." *People Experts*, 2017 U.S. Dist. LEXIS, at *14 (citations omitted).

## IV.   ARGUMENT

The facts established here demonstrate that Roadrunner is likely to succeed on the merits of its tortious interference and conversion claims, that Roadrunner will continue to suffer irreparable harm if TGS's wrongful conduct is unchecked by preliminary relief, that the balance of equities tip sharply in Roadrunner's favor, and that injunctive relief is in the public interest.  Thus, the facts demonstrate that an award of preliminary injunctive relief is warranted here under either formulation of the *Winter* test.

### A.   Roadrunner Will Succeed on the Merits of Multiple Claims

The Court need not find Roadrunner "carried [its] burden of proof on any single claim or on all claims, only that the proof supports a substantial likelihood of success on at least one claim or theory which in turn would support a preliminary injunction." *Atlanta Sch. of Kayaking, Inc. v. Douglasville-Douglas Cty. Water and Sewer Auth.*, 981 F. Supp. 1467, 1472 (N.D. Ga. 1997); *see also, e.g., Dr. Seuss Enters. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1397 (9th Cir. 1997) (affirming injunction issuance where plaintiff showed a likelihood of success on copyright, but not trademark claims).  Here, the facts show Roadrunner is substantially likely to succeed on its tortious interference and conversation claims.

#### 1.   The Evidence Overwhelmingly Supports Finding That TGS Tortiously Interfered with the SPA

Roadrunner is likely to succeed on the merits of its tortious inference claim because the SPA is valid and enforceable, TGS knew of the SPA before it Cox was hired, TGS performed intentional acts designed to breach or disrupt the SPA, the SPA was actually breached and disrupted, and Roadrunner suffered harm as a result. *Quelimane Co. v. Stewart Title Guar. Co.*, 19 Cal. 4th 26, 77 (1998).

### a.   The Validity and Enforceability of the SPA Is Governed By Delaware Law, and Under Delaware Law, the SPA Is Valid and Enforceable Against Cox

Initially, Roadrunner argues that for purposes of addressing this motion, the Court should assume the SPA is valid. *M-I LLC v. Argus Green LLC*, 2010 WL 11527419, at *2 (E.D. Tex. July 13, 2010), *report and recommendation adopted*, 2010 WL 11527418 (E.D. Tex. Aug. 26, 2010) (assuming a valid agreement on a motion for preliminary injunction where defendants argued covenant not to compete was invalid). No court has held to the contrary and minimal if any prejudice will result from that assumption given the temporary relief sought. In any event, however, a finding of validity is clearly warranted here.

Section 9.6 of the SPA sates that it is to be "governed by and construed in accordance with the laws of the state of Delaware (excluding any conflict of law rule or principle that would refer to the laws of another jurisdiction)."[7]  Delaware readily enforces non-competes in purchase agreements, as opposed to an employment contract, to protect the purchaser's enjoyment of the purchased business, *Brace Indus. Contr., Inc. v. Peterson Enters.*, 2016 Del. Ch. LEXIS 163, at *19 (Del. Ch. Oct. 31, 2016), requiring only that covenants be reasonable in geographic and temporal duration, advance a legitimate economic interest of the party seeking enforcement, and survive a balancing of the equities in order to be deemed enforceable. *Hough Assocs. v. Hill*, 2007 Del Ch. LEXIS 5, at *49 (Del. Ch. Jan. 17, 2007).

TGS and Cox

Cox Depo at 85:7-12; TGS Depo. at 77:12-18. None of those arguments hold weight under Delaware law.

First, for the reasons in the subsection below,                    *See* § IV(A)(1)(c).

Second, the term of the Non-Compete is reasonable. Indeed, non-competes with five-year terms "have been found reasonable by Delaware courts in cases where the restrictive covenant is executed as part of the sale of a business as a going concern." *Kan Di Ki, LLC v. Suer*, 2015 Del. Ch. LEXIS 191, at *68 (Del Ch. July 22, 2015) (finding five-year term reasonable) (citing *Tull v. Turek*, 38 Del. Ch. 182, 147 A.2d 658, 663-64 (Del. 1958) (ten-year term reasonable); *O'Leary v. Telecom Res. Serv., LLC*, 2011

---

[7] Here, California law does not conflict, but even if there was a conflicting rule, as discussed below, applying California law still would lead to the exact same result.

1   Del. Super. LEXIS 36, at *5 (Del. Super. Jan. 14, 2011) (four-year term reasonable); *Hough Assocs.,*

2   *Inc.*, 2007 Del. Ch. LEXIS 5, at *14 (five-year term reasonable)).

3        Third, the SPA's Non-Compete is geographically reasonable.  "A non-compete covenant will be

4   enforced only over a geographical area reasonable under the circumstances." *O'Leary*, 2011 Del. Super.

5   LEXIS 36, at *13 (finding non-compete with national scope reasonable).  "The overarching intent of a

6   non-compete covenant is to protect the geographical area where the business owner conduct business[.]"

7   *Id*.  Further, "Delaware law does not impose a strict requirement that the area covered by the covenant

8   map perfectly onto the geographical area of the plaintiff's business." *Kan Di Ki, LLC v. Suer*, 2015 Del.

9   Ch. LEXIS 191, at *69.

10       The SPA restricts Cox from competing with Roadrunner "anywhere in the United States…." *See*

11  SPA § 7.4(a)(i).  As noted above, this national restriction is not per se unreasonable and, in fact, was and

12  is necessary to protect the legitimate interests of Roadrunner (a company with national geographic reach

13  now and when the SPA was signed) against Cox, who when he owned Central Cal competed with TGS

14                                      Kirkland Decl., ¶ 3, Exh. 1; TGS Vol. 3 at 393:22-394:2.

15       Under Delaware law, therefore, the SPA is valid and enforceable against Cox.

16            ***b.***      ***Similarly, the SPA Is Clearly Enforceable Under California Law***

17       Of note, neither Roadrunner nor TGS nor Cox disputes that Roadrunner and Cox entered into the

18  SPA on November 2, 2012.  But while Roadrunner argues the SPA is valid and enforceable, TGS and

19  Cox argue the SPA and its Non-Compete provisions are null and void *under California law*,

20

21

22       First, Cox acknowledged the validity and enforceability of the Non-Compete when he signed the

23  SPA.  Specifically, in Section 7.4(c) of the SPA Cox represents he consulted with counsel before signing

24  the SPA and based on his consultation acknowledged that the Non-Compete was reasonable in terms of

25  duration, scope and area, and necessary to protect Roadrunner's legitimate interests.  In fact, Exhibit A

26  to the SPA is a legal opinion by the firm that represented Cox in the transaction that states that the SPA

27  is a "legal, valid and binding obligation[]" of Roadrunner and Cox that is "enforceable against [them]"

28

1  in accordance with its terms  Thus, Cox acknowledged the validity of the SPA contemporaneously with

2  its execution, a fact TGS or its counsel, knew or should have known about before deciding to hire him.

3      Second,

4           In a July 7, 2017 letter from Cox's counsel to Roadrunner's counsel in a separate but related

5  dispute, counsel advanced two arguments for finding the SPA and Non-Compete provisions invalid.

6  First, counsel argued that Roadrunner's alleged failure to make earn-out payments owed to Cox means

7  there was no transfer of goodwill in connection with the SPA, and thus that Cox cannot be subject to the

8  Non-Compete under California law.  Cal. Bus. & Prof. Code § 16601.  These arguments are mistaken.

9      To begin with, where, as here, "a covenant not to compete is executed as an adjunct of a sale of a

10  business there is an inference that the business had a 'goodwill' and that it was transferred."  *Monogram*

11  *Industries, Inc. v. Sar Industries, Inc.*, 64 Cal. App. 3d 692, 701 (1976).  Further here, the purchase price

12  Roadrunner paid Cox for Central Cal—including its goodwill—does not include any earn-out payments.

13  "Purchase Price" is defined in the SPA as a set dollar amount less debt and plus or minus available cash.

14  The SPA notes that "earn-outs" may increase the final amount Cox receives, but the earn-out provisions

15  state that they are "additional consideration," and *do not* provide that they are part of the Purchase Price.

16  Further, and notably, Cox acknowledged in Section 7.4(a) of the Non-Compete that the covenants given

17  thereunder were in "consideration of the payment of the *Purchase Price*[,]" not the earn-out payments.

18      Where a selling party is to remain with the acquired company post-sale, which was true of Cox's

19  sale of Central Cal to Roadrunner, earn-outs often serves "as a form of incentive-based compensation"

20  to the seller, "allow[ing] buyers to retain and motive management with aligned interests of maximizing

21  profit."[8]  Thus, in many ways the facts in this case are similar to *Alliant Ins. Services, Inc. v. Gaddy*, 159

22  Cal. App. 4th 1292 (2008).  There, the defendant argued performance under the underlying was excused

23  due to plaintiff's failure to make earn-out payments.  *Id.* at 1309.  The court of appeal disagreed, noting

24  among other things that defendant's claim for "money ar[ose] from his employment, not his sale of the

25  business, and the stock purchase agreement expressly stated" that the first payment received thereunder

26

27

---

[8] Paul M. Crimmins, *Earn-outs in M&A Transactions: Key Structures and Recent Developments*, 10 THE M&A JOURNAL, no. 10, at 1.

1 | "was full consideration for the restrictive covenants[.]"  *Id.*  Similar circumstances are present here.  In

2 | sum, for the reasons above, Cox's counsel's (and therefore TGS's) goodwill argument fails.

3 | Finally, under California law the Non-Compete's time and geographical restrictions are valid and

4 | enforceable.  In the connection with a business sale, "a covenant not to compete will be enforced to the

5 | extent that it is reasonable and necessary in terms of time, activity and territory to protect the buyer's

6 | interest."  *Monogram Industries, Inc. v. Sar Industries, Inc.*, 64 Cal. App. 3d 692, 698 (1976).

7 | California courts in past decisions have found a five-year temporal restriction valid.  *See Alliant*

8 | *Ins. Services, Inc. v. Gaddy*, 159 Cal. App. 4th 1292, 1296, 1301-07, 1312 (2008) (finding covenants

9 | imposing restrictions for five-year period valid; affirming order granting preliminary injunction); *Vacco*

10 | *Industries, Inc. v. Van Den Berg*, 5 Cal. App. 4th 34, 47-49 (1992) (finding a noncompetition agreement

11 | with five-year covenant not to compete "not prohibited by Business and Professions Code section 16600

12 | and … fully enforceable in spite of [plaintiff's] prior wrongful termination of [defendant]"); *Monogram*

13 | *Industries, Inc.*, 64 Cal. App. 3d at 696 (affirming injunction as to agreement with five-year term).

14 | The SPA also is valid and enforceable as to geographic scope.  Under Business and Professions

15 | Code section 16601, "the area where a business is 'carried on' is not limited to the locations of its

16 | buildings, plants and warehouses, nor the area in which it actually made sales.  The territorial limits are

17 | coextensive with the entire area in which the parties conducted all phases of their business including

18 | production, promotional and marketing activities as well as sales."  *Id.* at 702.  As TGS acknowledged,

19 |

20 |

21 | 394:2); and as further proof of Central Cal's reach at that time.

22 |

23 | If anything, the geographic limitation in the SPA was too narrow.  In any

24 | event, however, it did not then and does not now run afoul of California law.

25 | In sum, the SPA is a valid and enforceable agreement to which Cox remains bound.

26 | **c.   *TGS Knew of the SPA and its Non-Compete Provisions Yet Conspired***

27 | ***With Cox to Perform Acts Intended to Breach and Disrupt the SPA***

There is no dispute that, at all times relevant,

28 |

*See* Section II.G, *supra*.

TGS claims

*See* the SPA § 7.4; TGS Vol. 2 at 189:19-191:8

Notwithstanding                                                                                                TGS

proceeded

*See* Section II.G.3, *supra*; Lane

Decl., Exhs. F, Exh. E at TGS 241.

As the weeks in June progressed.

*See* Section II.G.4.

    **d.**    ***TGS Successfully Caused Cox to Breach and Thereby Disrupted the SPA, and Its Interference Has Inflicted and Continues to Inflict Serious, Irreparable Harm On Roadrunner***

TGS's efforts to contravene the SPA have garnered violations in each prohibited category.

First, hiring Cox before January 1, 2018 interferes with the Competing Employment provisions of Section 7.4(a)(i) of the SPA, which prohibits Cox from accepting a job with a company that competes with Roadrunner during the Restricted Period.

This act alone constitutes active, and still ongoing, interference with the SPA.

Second, TGS used to its benefit, and to Roadrunner's detriment, Cox's knowledge of Central Cal and Roadrunner's business and relationships to compete with Roadrunner.  Indeed, Cox's relationships with Central Cal customers allowed him to connect TGS with vital and high-ranking persons within the Roadrunner customers they targeted.  Once connected, TGS used Cox's goodwill with those customers, which was built up in conjunction with and nurtured by Central Cal, and Roadrunner's internal business

information, of which Cox was intimately familiar, to unfair compete for their business. These actions violate the Central Cal Knowledge provisions of the Non-Compete.

Third, as the evidence shows,

Specifically, TGS and Cox have persistently called and sent text messages to Roadrunner (and former Central Cal) employees, resulting in the departure of Grace Castaneda, Chris Rodriguez,

These actions violate the Non-Compete's Non-Solicitation provisions.

Finally, as discussed in Section IV(B), *infra*, with respect to the irreparable harm Roadrunner has suffered, TGS's interference with the SPA has been significantly aided by

in violation of the Confidentiality provisions of the Non-Compete.

TGS's breaches and disruptions of the SPA have harmed Roadrunner's business operations and financial health. Roadrunner has been and continues to be irreparably harmed, and has already lost three customers, millions of dollars in lost revenue per year, five employees, and 20 drivers to TGS to date, which is but a fraction of the known Roadrunner customers, employees and drivers TGS and Cox have solicited. In 2016, Roadrunner's revenue attributable to the three customers lost to TGS account for

### 2.   The Evidence Demonstrates That TGS Tortiously Interfered with Roadrunner's Prospective Economic Relations

Tortious interference with prospective economic relations protects the expectancy that arises out of an existing business relationship. *Oracle Am., Inc. v. Cedarcrestone, Inc.*, 2013 U.S. Dist. 89986, at *10 (N.D. Cal. June 26, 2013); *Roth v. Rhodes*, 25 Cal. App. 4th 530, 546 (1994). To show interference one must show: (1) an economic relationship between the plaintiff and a third party, with the probability of future economic benefits; (2) defendant's knowledge of and (3) intentional wrongful acts designed to disrupt the relationship; (4) disruption; and (5) economic harm to plaintiff resulting from the defendant's acts. *Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137, 1151 (9th Cir. 2008); *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1153 (2003).

Before Cox joined TGS, Roadrunner had economic relations with customers Minturn Nut and Sierra Valley Almond, among others.  Cox

Between July and August 2017, Roadrunner lost the business of Minturn, Sierra Valley, and other accounts, to TGS,

The Minturn, Sierra Valley and Expeditors accounts constituted several million dollars of Roadrunner's 2016 year end revenue for the Central Cal business, which is but a portion of the financial harm occasioned by TGS's interference.  Kirkland Decl., ¶¶11-12.  TGS's interference therefore has caused Roadrunner economic harm.

These facts show that Roadrunner is likely to succeed on the merits of its tortious inference with prospective economic relations claim against TGS.

### 3.     The Evidence Demonstrates That TGS Converted Roadrunner's Property

"Conversion is the wrongful exercise of dominion over the property of another."  *Farmers Ins. Exchange v. Zerin*, 53 Cal. App. 4th 445, 452 (1997) (citation omitted).  In California, conversion is not confined to tangible property.  *Baiul v. NBC Sports*, 2016 U.S. Dist. LEXIS 13021, at *4 (C.D. Cal. Feb. 2, 2016) (citations omitted).  Rather, "[w]here 'both the property and the owner's right of possession and exclusive use are sufficiently definite and certain[,]'" conversion of an intangible interest is actionable.  *See United States Legal Support, Inc. v. Hofioni*, 2013 U.S. Dist. LEXIS 179282, at 35-36 (E.D. Cal. Dec. 19, 2013) (quoting *Fremont Indem. Co. v. Fremont Gen. Corp.*, 148 Cal. App. 4th 97, 125 (2007).

TGS has converted confidential information of Roadrunner, which Roadrunner has a definite and certain right of possession and exclusive use.  "Confidential information" is broadly defined in the SPA, including internal business information; confidential information of customers, independent contractors, and other business relations of Central Cal; and trade secrets.  SPA § 10.6.  TGS and Cox

However, their possession of that knowledge did nothing to slow the progress of their conversion of Roadrunner's confidential information.  Indeed

And TGS's conversion of Roadrunner's property has maintained a steady pace since By early July,

Deposition testimony and documents produced by TGS and Cox establish

It is likely, therefore, that Roadrunner will succeed on the merits of its conversion claim.[9]

## B.   Roadrunner Will Continue to Suffer Substantial, Egregious and Irreparable Harm Without an Injunction

A plaintiff seeking a preliminary injunction must show that it will likely suffer irreparable harm absent relief.  *See Herb Reed Enters., LLC v. Florida Entm't Mgmt., Inc*., 736 F.3d 1239, 1249 (9th Cir. 2012).  Harm is "irreparable" if it cannot adequately be compensated by legal remedies.  *PolyPortables*, 2016 U.S. Dist. LEXIS, at *7; *see also Los Angeles Mem'l Coliseum Comm'n*, 634 F.2d 1197, 1202 (9th Cir. 1980) ("monetary injury is not normally considered irreparable").  Roadrunner is likely to suffer irreparable harm in at least three ways absent the entry of a preliminary injunction.

First, while monetary injury is not normally considered irreparable, when the evidence suggests a

---

[9] Cox was assigned a computer tower that was located in Cox's office at Roadrunner's Fresno location at 3032 East Central Avenue (the "Premises").  Declaration of Mark Avila ("Avila Decl."), ¶ 2-3.  Cox is a landlord of and thus has keys to the Premises.  Cox Depo. At 76:11-13.  The computer tower remained in Cox's vacated office from the day he left Roadrunner, May 31, 2017, until on or around August 7, 2017 (the date on which Roadrunner filed its Complaint in this action).  At that time, Roadrunner discovered that it had been removed.  Avila Decl., ¶ 4.  Roadrunner attempted but was unable to locate the computer tower via its internet protocol (IP) address.  Avila Decl., ¶ 5.  On September 25, 2017, counsel for Roadrunner sent counsel for Cox a letter informing him of Cox's missing tower.  Lane Decl., Exh. J..  In a September 26, 2017 in response, Cox's counsel suggested Cox had been assigned only a laptop while working at Roadrunner's Fresno location.  Lane Decl., Exh. K..  However, this representation is contrary to Cox's deposition testimony, where he acknowledged having *both* a laptop and computer tower.  *See* Cox Depo. at 74:5-10.

substantial loss "would threaten the existence of plaintiff or result in fundamental changes to its ability to continue in business," irreparable injury may exist. *See PolyPortables*, 2016 U.S. Dist. LEXIS, at *7; *Converdyn v. Moniz*, 68 F. Supp. 3d 34, 48 (D.D.C. Sept. 12, 2014) (claim of substantial loss evaluated in terms of the business's total revenues to decide if harm is of a magnitude warranting injunctive relief).

Roadrunner's financial losses attributable to TGS's interference are of a magnitude that warrants injunctive relief.  The three former Central Cal customers known to have left Roadrunner for TGS since June 1 because of TGS and Cox's improper solicitations represent millions of dollars of Roadrunner's 2016 revenue total,                                                                                     Kirkland Decl. ¶¶11-12.  Those losses are a devastating blow to Roadrunner that may affect its ability to carry out its business long-term.  *Id.*, ¶ 12.  Thus, Roadrunner's current and expected financial losses constitute irreparable harm.

Second, just as customer solicitations in violation of a non-compete constitutes irreparable harm, "'the violation of a non-compete by the solicitation of employees also constitutes irreparable harm.'" *Global Switching Inc. v. Kasper*, 2006 U.S. Dist. LEXIS 44450, at *37 (E.D.N.Y. June 29, 2006); *see also, e.g.*, *Cenveo Corp. v. Diversapack LLC*, 2009 U.S. Dist. LEXIS 91535, at *27 (S.D.N.Y. Oct. 1, 2009) (the decline in productivity and profitability due to employee departure to a direct competitor can show irreparable harm); *Terex Corp. v. Cubex, Ltd.*, 2006 U.S. Dist. LEXIS 88863, at *34 (N.D. Tex. Dec. 7, 2006) (losing key employee can constitute irreparable harm); *Diamond Blade Warehouse, Inc. v. Paramount Diamond Tools, Inc.* 420 F. Supp. 2d 866, 872 (N.D. Ill. 2006) (defendants cannot pilfer customers and employees, and also injure goodwill, competitive position, and the continuity of business relationships); *Marsh USA Inc. v. Karasaki*, 2008 U.S. Dist. LEXIS 90986, at *42-43 (S.D.N.Y. Oct. 30, 2008) (the loss of an investment in training and developing employees can constitute irreparable harm).

TGS's targeted and sadly successful assault on Roadrunner's business, with Cox's assistance, has not only been directed at Roadrunner's balance sheet.  TGS has also targeted Roadrunner's employees.

By early July, TGS's                    and persistent solicitation efforts claimed four Roadrunner employees.  The departure of each individual employee and the investment

Roadrunner made in them is a significant loss, but that loss is amplified further by their proximity, and the prospective of others to come absent injunctive relief. TGS's employee solicitations are therefore sufficient on their own to constitute irreparable harm.

Finally, the "use of confidential information by a former employee in order to compete with their former employer represents irreparable harm." *Allied N. Am. Ins. Brokerage Corp. v. Woodruff-Sawyer*, 2005 U.S. Dist. LEXIS 47388, at *42-45 (N.D. Cal. Feb. 19, 2005) (finding in a case with similar facts where defendant moved from one employer to another that the former employer would suffer irreparable harm from the defendants' use of its confidential information, including any proprietary knowledge the individual defendant may have retained, to solicit and compete); *see also, e.g., Alexander & Alexander Ben. Services, Inc. v. Benefit Brokers & Consultants, Inc.*, 756 F. Supp. 1408, 1415 (D. Or. 1991).

While *Winter* requires a likelihood of irreparable harm, California courts view misappropriation and use of confidential or proprietary information as a strong indication of irreparable harm; particularly in cases where customers or goodwill are threatened. *See Farmers Ins. Exch. v. Steele Ins. Agency, Inc.*, 2013 U.S. Dist. LEXIS 70098, at *35-36 (E.D. Cal. May 16, 2013). "Furthermore, when a plaintiff risks losing established customers to defendants due to the defendants' improper use of the plaintiff's proprietary information, there is obviously a lasting, irreparable harm." *Id.* (internal alterations omitted) (citing *Lillge v. Verity*, 2007 U.S. Dist. LEXIS 73543, at *7 (N.D. Cal. Oct. 2, 2007)).

Such was true in *Wyndham Resort Dev. Corp. v. Bingham*, 2010 U.S. Dist. LEXIS 80608 (E.D. Cal. July 8, 2010). In *Wyndham*, a former employee of Wyndham, which sells timeshares, tried to sell Wyndham's customer list to a third-party broker. *Id.* at *5-6. Wyndham argued defendant's continued disclosure of its customer list would harm its sales and harm its goodwill with its customers, and the court agreed, finding Wyndham's representations sufficient to establish a likelihood of irreparable harm. *Id.* at *16-17; *see also, e.g., Stuhlbarg Int'l Sales Co. v. John D. Brush and Co., Inc.*, 240 F.3d 832, 841 (9th Cir. 2001) ("Evidence of threatened loss of prospective customers or goodwill … supports a finding of the possibility of irreparable harm."); *TMX Funding, Inc. v. Impero Techs., Inc.*, 2010 U.S. Dist. LEXIS 37064, at *8 (N.D. Cal. Mar. 18, 2010) ("California courts have presumed irreparable harm when proprietary information is misappropriated"); *Lillge v. Verity*, 2007 U.S. Dist. LEXIS 73543, at *7

(N.D. Cal. Oct. 2, 2007) (the "risk of losing established customers to defendants' . . . due to defendants' improper use of plaintiff's proprietary information would obviously create a lasting, irreparable harm").

Such is also true here.  Neither TGS nor Cox dispute

The information Cox possesses is critical to Roadrunner/Central Cal's existence, given that Cox

And while TGS may piously declare that it has not used such information to its advantage, the evidence that has already been unearthed demonstrates otherwise. Thus, while the mere fact of misappropriation of Roadrunner's confidential and proprietary information *may* be sufficient to support a finding of likely irreparable harm, the use of that information whether by TGS or through Cox, and the resulting financial impact and harm to Roadrunner's goodwill with its customers and within the drayage industry (particularly from Cox's involvement owing to his ill will toward Roadrunner) most certainly supports a finding of likely irreparable harm.  *MySpace, Inc. v. Wallace*, 498 F. Supp. 2d 1293, 1305 (C.D. Cal. 2007) (damage to a business's goodwill is often very difficult to calculate and thus considered irreparable).

TGS's solicitation of Roadrunner's customers and employees and TGS's misappropriation and use of Roadrunner's confidential information each independently support a finding of irreparable harm.

C.     **The Enormous, Irreparable Harm to Roadrunner Outweighs Any Inconvenience to TGS**

Courts must balance competing claims of injury and consider the effect on each party of the granting or withholding injunctive relief.  *Winter*, 555 U.S. at 24.  That balance generally tips to the plaintiff if plaintiff's harm will be permanent and defendant's harm is temporary.  *League of Wilderness Defenders/Blue Mountain Biodiversity Project*, 752 F.3d 755, 765 (9th Cir. 2014).

The irreparable injuries that Roadrunner has already incurred due to TGS's interference are three customers, millions of dollars in lost revenue per year, five employees, at least twenty drivers, and a substantial amount of confidential information.  Also highly impactful is the effect of TGS's

interference activities on Roadrunner's goodwill and standing in the drayage industry.  But the most significant harm arises from the confluence of those harms.  Given the harm TGS has inflicted on Roadrunner in just four months, it is possible if not likely that the irreparable harm it ultimately suffers will become permanent if TGS continues its concerted campaign of SPA interference unchecked by an injunction.

By contrast, TGS will not suffer from a grant of temporary injunctive relief.  Since Roadrunner requests only that the Court hold TGS to the duration restriction in the SPA, adjusted equitably as appropriate to account for the time TGS has employed Cox in violation of the SPA, the injunction will be reasonable. TGS's actions to date belie the veracity of its claim

*See* TGS Vol. 3 at 345:7-15.  To the contrary, Cox has been the lynchpin of TGS's assault on Roadrunner.  TGS is unfairly profiting from Cox's knowledge in soliciting Roadrunner's customers, employees, and drivers, so it can hardly claim any prejudice by being deprived of further unfair conduct. And TGS can still freely compete, particularly in light of its representations that

*Id*. at 110:3-6.

Further, any injury a defendant may suffer is discounted where the defendant brought the injury on itself.  *IHOP Franchising, LLC v. Hameed*, 2015 U.S. Dist. LEXIS 12021, at *15 (E.D. Cal. Jan. 30, 2015).  Any injury TGS could incur from the grant of temporary relief here should be discounted as self-inflicted.  TGS                                                                           TGS claims that

Even today, TGS has stuck with its willful ignorance and                           TGS Vol. 1 at 49:15-50:6.

TGS's counsel

TGS never contacted Roadrunner for its stance on the validity and applicability of the Non-Compete and waited until *after* Cox was hired to meet with counsel to discuss it.  And perhaps the most telling indication that TGS knew Roadrunner would challenge Cox's hiring and thus that TGS knew temporary injury could result is that

TGS Vol. 3 at 388:13-389:9.

Finally, Section 7.4(b) of the SPA expressly contemplates the possibility that an injunction may be sought and granted in the event the SPA is violated by Cox or his affiliates, in this case TGS.  TGS, as set forth above, had every opportunity to know of and thus prepare for this possibility before choosing to hire Cox and engage in activities that clearly violate the SPA.

The foregoing clearly establishes that the balance of hardship here tips sharply in Roadrunner's favor and support the grant of temporary injunctive relief.

**D.**   **The Public Interest Favors an Injunction**

The public interest prong of the preliminary injunction analysis requires consideration of whether there exists" some critical public interest that would be injured by the grant of preliminary relief." *Beltz v. Wells Fargo Home Mortg.*, 2017 U.S. Dist. LEXIS 29140, at *47 (E.D. Cal. Feb. 27, 2017) (citation omitted). No critical public interest is injured by the grant of temporary relief in this private commercial dispute.  Granting an injunction will impact TGS's ability to improperly solicit Roadrunner's customers, but those customers' ability to procure drayage services, from Roadrunner or another provider, will only be nominally impacted, if at all.  Temporary cessation of TGS's solicitation of Roadrunner's drivers and employees does not limit their mobility.  And though enjoining Cox's employment with TGS may affect Cox, (1) the effect will be short-lived, and (2) Cox knowingly, and on the advice of counsel, accepted that potential outcome.  Thus, no critical public interest will be frustrated by temporary injunctive relief here, which will only serve to protect Roadrunner and preserve the status quo contemplated in the SPA.

On the other hand, the public has a fundamental interest in ensuring such contracts are enforced. Fundamental to the preservation of the fee market system is the right to have the ingenuity, industry and millions of dollars Roadrunner invested in the success of its business protected from TGS's gratuitous misuse of that investment and effort.  See, e.g., Morlife Inc. v. Perry, 56 Cal.App.4th 1514 (1997).

**E.**   **Bond**

Rule 65(c) of the Federal Rule of Civil Procedure provides in relevant part that "[t]he court may issue a preliminary injunction . . . only if the movant gives security in an amount the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  However, a district court retains discretion "as to the amount of security required, *if any*."

1  *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (internal quotation marks and citations

2  omitted) (emphasis in original).  The court may dispense with the filing of a bond if "there is no realistic

3  likelihood of harm to the defendant from enjoining his or her conduct." *Jorgensen v. Cassiday*, 320 F.3d

4  906, 919 (9th Cir. 2003).  All that is sought to be preliminarily enjoined here is TGS's wholesale,

5  tortious interference with a contract, among other torts outlined above. Thus, for the reasons above,

6  Plaintiff asks that the Court exercise its discretion here and dispense with the bond requirement.

7  **V.    HEARING REQUESTED**

8       Pursuant to Local Rule 231(d)(3), Roadrunner respectfully requests a hearing on the instant

9  motion and, at present, does not anticipate presenting oral testimony, unless asked to do so by the Court.

10  Roadrunner believes the hearing will be focused on the SPA

11                                      and should take no longer than one hour or, at most, two

12  hours should it decide to present testimony.

13  **VI.    CONCLUSION**

14       The foregoing establishes that: (1) Roadrunner has established a likelihood of success on the

15  merits of its tortious interference and conversion claims; (2) Roadrunner has and will suffer irreparable

16  injury absent injunctive relief; (3) the balance of hardships tips sharply if not entirely to Roadrunner; and

17  (4) the public will not be injured by any grant of injunctive relief.

18       Accordingly, under either the standard or "serious questions" formulation of the *Winter* test, a

19  preliminary injunction may and should be granted to protect Roadrunner from further harm and preserve

20  the status quo pending a full and fair determination of Roadrunner's rights by this Court.

21       Nor should injunctive relief blindside or be unfair to TGS because, as mentioned above, Section

22  7.4(b) of the SPA expressly states that any breach or violation of Section 7.4(a) may inflict irreparable

23  harm on Roadrunner in a monetary amount virtually impossible to ascertain, thus entitled Roadrunner to

24  an injunction enjoining and restraining the breach or violation.  Whether or not TGS truly believes that

25  the SPA is unenforceable, it either knew or should have known that an injunction might follow from its

26  concerted interference with the SPA's terms.

27       Roadrunner therefore respectfully requests that this Court issue a preliminary injunction in the

28  form of the proposed order submitted herewith.

Dated:  October 9, 2017

GREENBERG TRAURIG, LLP

By:  /s/ Kurt A. Kappes
    Kurt A. Kappes
    Michael D. Lane
    Sean A. Newland
    Attorneys for Plaintiffs, ROADRUNNER

MPA I/S/O MOTION FOR PRELIMINARY INJUNCTION