UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROADRUNNER INTERMODAL SERVICES, LLC, a Delaware limited liability company,<br><br>                    Plaintiff,<br><br>          v.<br><br>T.G.S. TRANSPORTATION, INC., a California corporation, and DOES 1-10,<br><br>                    Defendants. | No. 1:17-cv-01207-DAD-BAM, 1:17-cv-01056-DAD-BAM (consolidated)<br><br><br>ORDER GRANTING IN PART AND DENYING IN PART T.G.S. TRANSPORTATION'S MOTION FOR SUMMARY JUDGMENT<br><br>(Doc. No. 218) |
| JEFFREY COX,<br><br>                    Plaintiff,<br><br>          v.<br><br>ROADRUNNER INTERMODAL SERVICES, LLC, a Delaware limited liability company, CENTRAL CAL TRANSPORTATION, LLC, a Delaware limited liability company, and DOES 1 through 50,<br><br>                    Defendants. | |

1

| | |
|---|---|
| ROADRUNNER INTERMODAL SERVICES, LLC, a Delaware limited liability company, | |
| | Counter-Plaintiff and Defendant, |
| v. | |
| JEFFREY COX, | |
| | Counter-Defendant and Plaintiff. |

Before the court is defendant T.G.S. Transportation, Inc's ("TGS") motion for summary judgment as to plaintiff Roadrunner Intermodal Services, LLC's ("Roadrunner") claims. (Doc. No. 218.)[1] A hearing on this motion was held on July 16, 2019. (Doc. No. 236.) Attorneys Kurt Kappes and Todd Pickles appeared on behalf of Roadrunner and attorneys Scott Ivy and Shane Smith appeared on behalf of TGS. Having reviewed the parties' briefing and heard oral argument, and for the reasons that follow, TGS' motion for summary judgment will be granted in part and denied in part.

## BACKGROUND

The factual background of this case has been discussed in the court's prior orders denying Roadrunner's motion for a preliminary injunction, denying plaintiff Jeffrey Cox's partial motion for summary judgment, and granting in part and denying in part Roadrunner's motion for summary judgment as to plaintiff Cox's claims. (*See* Doc. Nos. 90 at 2–4; 199 at 2–4; 244 at 2–4.) That background will not be repeated here in its entirety. Only those facts relevant to the

/////

---

[1] The undersigned apologizes for the excessive delay in the issuance of this order. This court's overwhelming caseload has been well publicized and the long-standing lack of judicial resources in this district has reached crisis proportion. Unfortunately, that situation sometimes results in the court not being able to issue orders in submitted civil matters within an acceptable period of time. This situation is frustrating to the court, which fully realizes how incredibly frustrating it is to the parties and their counsel. The undersigned does pause to note that the parties' manner of briefing and redaction practices certainly did not make the court's task any easier.

disposition of the pending motion for summary judgment will be set forth below.[2]

Roadrunner is an industry leader in providing regional and national drayage services throughout the United States.  (Doc. No. 22 at 3.)  Central Cal is a smaller regional trucking company that operates trucking routes within California, Nevada, and Oregon for clients throughout the country.  (*See* Doc. No. 98 at ¶¶ 5–6.)  Plaintiff Cox was previously a co-owner of Central Cal, along with David Chidester.  (*See* Doc. No. 175 at 7.)  On November 2, 2012, Roadrunner, Central Cal, plaintiff Cox, and Mr. Chidester entered into a stock purchase agreement ("SPA") in which Roadrunner purchased all of the stock and assets of Central Cal and Double C Transportation, another trucking company, for approximately $3.8 million.  (*See* Doc. No. 90 at 2–4.)  The SPA included non-competition, non-solicitation, and non-disclosure provisions that limited plaintiff Cox's conduct in the future, at least through 2017.  (*See* Doc. No. 199 at 3.)  Section 7.4(a)(i)(B) of the SPA states that through December 31, 2017 plaintiff Cox "may not work for or with . . . any entity. . . that competes with or is planning to compete with Roadrunner in any way . . . ."  (Doc. No. 22 at 34.)

After the sale of Central Cal and Double C to Roadrunner, plaintiff Cox went to work for Central Cal, where he has asserted he observed "financial irregularities in the accountings performed by Central Cal and other Roadrunner subsidiaries that, he believed, were consistent with the perpetration of fraud."  (Doc. No. 30-1 at 10.)  On or about February 16, 2017, plaintiff Cox filed a lawsuit against Roadrunner in Los Angeles County Superior Court, alleging that it had engaged in fraud and deceit, securities fraud, and had unfairly retaliated against him.  (Doc. No. 48 at 11.)  After an unsuccessful mediation session in connection with that action, plaintiff Cox was terminated from his employment with Central Cal and Roadrunner.  (*Id.*)

/////

---

[2]  This factual background is derived from the following sources:  Roadrunner's first amended complaint (Doc. No. 22 ("FAC")); TGS' motion to consolidate cases (Doc. No. 30); TGS' opposition to the initial motion for preliminary injunction (Doc. No. 48); Roadrunner's memorandum in support of its motion for preliminary injunction (Doc. No. 87); Roadrunner's motion for summary judgment (Doc. No. 175); TGS' motion for summary judgment (Doc. No. 218); Roadrunner's opposition to TGS' motion for summary judgment (Doc. No. 240); and TGS' reply with regard to its motion for summary judgment (Doc. No. 247).

Following his termination, plaintiff Cox accepted employment with TGS, a competitor of Central Cal and Roadrunner, on or around July 1, 2017.  (Doc. No. 238 at 7.)  What occurred following plaintiff Cox's termination from Central Cal is disputed by the parties.  TGS asserts that several customers proactively contacted plaintiff Cox after word spread of his termination, asking him for recommendations for transportation companies they could then do business with now that he was gone.  (Doc. No. 48 at 11.)  TGS also claims that some Roadrunner employees contacted plaintiff Cox proactively to request TGS' contact information so that they could also make the move from Roadrunner to TGS.  (*Id.*)  Meanwhile, Roadrunner asserts that immediately after his termination from Central Cal, plaintiff Cox met with the owners and operators of TGS to discuss how to raid the Central Cal business within Roadrunner by capturing its customers, employees, and drivers for TGS.  (Doc. No. 87 at 7.)  Roadrunner alleges that even prior to the start of his employment with TGS, plaintiff Cox provided information to TGS including customer contact information, monthly revenue, and daily truck loads associated with Roadrunner customers, employee contact information, and salary ranges of employees.  (*Id.*)

On July 25, 2017, plaintiff Cox filed a complaint against Roadrunner in Fresno County Superior Court asserting causes of action related to his allegedly wrongful termination.  (*See* Doc. No. 244 at 5.)[3]  Roadrunner filed its own action against TGS in this court on August 7, 2017.  (Doc. No. 1.)  On September 1, 2017, Roadrunner filed a FAC pursuant to the parties' stipulation.  (Doc. Nos. 21, FAC.)  Roadrunner's FAC asserts causes of action for (1) tortious interference

/////

---

[3]  On February 7, 2018, the court denied Roadrunner's motion for a preliminary injunction, granted TGS' motion to consolidate this case with *Cox v. Roadrunner Intermodal Services, LLC, et al.*, No. 1:17-cv-01207-DAD-BAM (E.D. Cal.), and granted plaintiff Cox's motion to intervene.  (*See* Doc. No. 90.)  Additionally, on March 28, 2019, the court denied plaintiff Cox's motion for partial summary judgment on his ninth cause of action, which sought a declaratory judgment regarding the legality of the non-competition provisions of the parties' SPA.  (*See* Doc. No. 199.)  Finally, the court granted in part and denied in part Roadrunner's motion for summary judgment as to plaintiff Cox on August 21, 2019.  (Doc. No. 244.)  The court denied the motion as to plaintiff Cox's first two claims alleging retaliation and his third claim for wrongful termination in violation of public policy.  (*Id.* at 30.)  The court then granted the motion as to plaintiff Cox's fourth claim for libel, fifth claim for slander, sixth claim for failure to pay all wages, seventh claim for intentional interference with prospective economic advantage, and eighth claim for an inaccurate wage statement.  (*Id.* at 31.)

with contract, (2) tortious interference with prospective economic relationship, (3) unjust enrichment/restitution, (4) unfair competition, and (5) conversion. *Id.*

On June 7, 2019, TGS filed the pending motion for summary judgment as to Roadrunner's claims against it. (Doc. Nos. 218, 238.) Roadrunner filed an opposition on July 2, 2019. (Doc. Nos. 222, 240.) TGS filed a reply on July 9, 2019. (Doc. Nos. 228, 239.)[4]

## LEGAL STANDARD

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

In summary judgment practice, the moving party "initially bears the burden of proving the absence of a genuine issue of material fact." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The moving party may accomplish this by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," or by showing that such materials "do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A), (B). When the non-moving party bears the burden of proof at trial, as plaintiff does here, "the moving party need only prove that there is an absence of evidence to support the non-moving party's case." *Oracle Corp.*, 627 F.3d at 387 (citing *Celotex*, 477 U.S. at 325); *see also* Fed. R. Civ. P. 56(c)(1)(B). Indeed, summary judgment should be entered, after

---

[4] At the hearing on this motion, the court ordered both parties to resubmit unredacted versions of their briefs clarifying where the disputed evidence was in the record before the court, finding the briefing incomprehensible in this regard as originally submitted. (Doc. No. 236.) On July 19, 2019, TGS submitted amended versions of its original motion and its reply. (Doc. Nos. 238, 239.) On July 22, 2019, Roadrunner submitted an amended version of its opposition brief. (Doc. No. 240.) Noting that the parties' new briefing remained redacted despite the court's instructions to the contrary, on April 15, 2021, the court directed both parties to file sealed versions of their briefing and exhibits. (Doc. No. 246.) On April 15, 2021, TGS filed a sealed version of its reply in support of its motion for summary judgment. (Doc. No. 247.) On April 21, 2021, Roadrunner filed a sealed version of its opposition to the pending motion. (Doc. No. 248.)

adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *See Celotex*, 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322–23. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment . . . is satisfied." *Id.* at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In attempting to establish the existence of a factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits or admissible discovery material in support of its contention that the dispute exists. *See* Fed. R. Civ. P. 56(c)(1); *Matsushita*, 475 U.S. at 586 n.11; *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002) ("A trial court can only consider admissible evidence in ruling on a motion for summary judgment."). The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the non-moving party, *see Anderson*, 477 U.S. at 250; *Wool v. Tandem Computs. Inc.*, 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv.*, 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita*, 475 U.S. at 587 (citations omitted).

/////

"In evaluating the evidence to determine whether there is a genuine issue of fact," the court draws "all inferences supported by the evidence in favor of the non-moving party." *Walls v. Cent. Contra Costa Cnty. Transit Auth.*, 653 F.3d 963, 966 (9th Cir. 2011). It is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *See Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted).

## ANALYSIS

### A.      Whether TGS' Actions Proximately Caused Roadrunner's Harm

TGS and Roadrunner's dispute put at issue by the pending motion for summary judgment centers on whether Roadrunner can prevail on its interference claims as a matter of law by establishing that TGS' wrongful conduct was the proximate cause of the alleged lost profits from thirteen specific customers that Roadrunner contends moved their business from Roadrunner to TGS. (Doc. Nos. 238 at 5; 240 at 5.) Specifically, Roadrunner has claimed that the following companies moved their business from Roadrunner to TGS due to alleged misconduct on the part of TGS and Cox: (1) Minturn Nut Company; (2) Sierra Valley Almonds; (3) Netafim USA; (4) Liberty Transportation; (5) Expeditors International; (6) Elk Ridge Almonds; (7) National Raisin Company; (8) Hub Group Trucking; (9) CAI International; (10) UPS Supply Chain Solutions; (11) Meridian Nut Growers; (12) Victor Packing; and (13) Zymex Industries.[5] (*Id.*)

To prevail on its interference with contract claim, Roadrunner must demonstrate, among other things, resulting damage caused by TGS. *See Family Home and Fin. Ctr. v. Fed Home Loan Mortg. Corp.*, 525 F.3d 822, 825 (9th Cir. 2008) (citing *Pac. Gas. & Elec. Co. v. Bear*

---

[5] Roadrunner concedes in its opposition to the pending motion for summary judgment that "based on the current state of the evidence, Roadrunner does not identify [Victor Packing or Zymex Industries] as having moved some or all of their business to TGS." (Doc. No. 240 at 11 n.3.) In light of this concession, the court will grant TGS' motion for summary judgement with regard to Roadrunner's claims as they relate to Victor Packing and Zymex Industries.

*Stearns & Co.*, 60 Cal. 3d 1118 (1990)).  Similarly, to prevail on its intentional interference with prospective economic advantage claim, Roadrunner must establish economic harm caused by the acts of TGS.  *See Youst v. Longo*, 43 Cal. 3d 64, 71 n.6 (1987); *Marsh v. Anesthesia Servs. Med. Grp. Inc.*, 200 Cal. App. 4th 480, 504 (2011).  Under California law, the test for causation is whether the alleged conduct played a "substantial factor" in causing damages.  *See US Ecology v. California*, 129 Cal. App. 4th 887, 909 (2005); *Rutherford v. Owens-Illinois, Inc.*, 16 Cal. 4th 953, 968-69 (1997).  "The term 'substantial factor' has not been judicially defined with specificity, and indeed it has been observed that it is 'neither possible nor desirable to reduce it to any lower terms.'"  *Rutherford*, 16 Cal. 4th at 966 (citation omitted).  "'Although a finding of causation may not be based on mere speculation or conjecture, such finding may be predicated on reasonable inferences drawn from circumstantial evidence.'"  *City of Modesto v. Dow Chemical Co.*, 19 Cal. App. 5th 130, 153 (2018) (quoting *Smith v. Lockheed Propulsion Co.*, 247 Cal. App. 2d 774, 780 (1967)).  In a summary judgment motion, the court "may enter an order stating any material fact—including an item of damages or other relief—that is not genuinely in dispute and treating the fact as established."  Fed. R. Civ. P. 56(a).  "Causation is ordinarily a question of fact for the jury."  *Altman v. HO Sports Co.*, 821 F. Supp. 2d 1178, 1193 (E.D. Cal. 2011) (citations omitted).  However, causation remains suited for summary judgment if there is no evidence or reasonable inference from the evidence that could allow a reasonable jury to find causation.  *See Ortega v. Kmart Corp.*, 26 Cal. 4th 1200, 1205 (2001) (holding "substantial factor" causation is a factual question for the jury unless facts regarding causation are undisputed); *J.P. v. City of Porterville*, 801 F. Supp. 2d 965, 990 (E.D. Cal. 2011) ("Ordinarily, the issues of breach and causation are questions of fact for the jury.") (citing *Lindstrom v. Hertz Corp.*, 81 Cal. App. 4th 664, 652 (2004)).

In its pending motion, TGS argues that "[e]ven if all of the alleged conduct of TGS and Mr. Cox were proven true, the evidence is clear that none of that conduct was the proximate cause of the alleged disruption in Roadrunner's relationships with the 13 at issue customers."  (Doc. No. 238 at 6.)  In opposition, Roadrunner argues that "[f]or each of the customers for which Roadrunner is currently seeking damages, there is admissible evidence that Cox's and TGS's

8

actions were a substantial factor in Roadrunner's loss of the customers' business to TGS." (Doc. No. 240 at 6.) Roadrunner also claims that the issue of causation applies to both its lost profits as well as any resulting unjust enrichment on the part of TGS. (*Id.*)

Resolution of the pending motion for summary judgment rests on whether Roadrunner has come forward with sufficient evidence to raise a triable issue of material fact as to whether TGS caused its claimed damages. (Doc. No. 238 at 5.) Accordingly, the court will address the evidence submitted on summary judgment and the parties' arguments with respect to each of the thirteen disputed customers in turn.

1. Expeditors International

In its motion, TGS argues that "Expeditors moved its business from Roadrunner due to months of performance issues, and not any solicitation from TGS or Mr. Cox, and that Expeditors sent that business to companies other than TGS." (Doc. No. 238 at 8.) TGS asserts that at his deposition Robert Flores, a service provider manager for Expeditors International, testified that "Expeditors chose to terminate its relationship with Roadrunner in June 2017 due to a 'downward spiral' of service failures and accounting problems that began six months before Mr. Cox was fired." (*Id.*) (citing Doc. No. 218-4 at 9.) TGS also notes that Mr. Flores "testified that almost a year after Mr. Cox left Roadrunner and joined TGS, Expeditors began sending work to TGS, but it was not the work that had previously gone to Roadrunner . . . ." (*Id.*) (citing Doc. No. 218-4 at 12.) Lastly, TGS claims that "each side's expert agrees that [Expeditors] should be excluded from any measure of damages." (*Id.* at 21.) (citing Doc. No. 218-7 at 12–14.)

In opposition, Roadrunner argues that "[w]ithin a few frenzied months of Cox joining TGS, his and TGS's efforts to steal Roadrunner's customers bore fruit." (Doc. No. 240 at 10.) Roadrunner cites to an email sent to Tim Schneider, President of TGS, in September 2017 by a banker working to secure financing for TGS. (*Id.*) Therein, the banker wrote, "Tim, I asked Jeff [Cox] to shoot off a few names of the business he is bringing to TGS . . . . Can you tell me some of your new business." (*Id.*) In response to this email, Mr. Schneider identified Expeditors as new business for TGS. (*Id.*)

/////

9

Roadrunner concedes that TGS did not do business for Expeditors until May 2018, but argues that the process of TGS securing their business began in July 2017 with plaintiff Cox's arrival at TGS. (*Id.* at 14.) Roadrunner further argues that in July or August 2017, "TGS and Cox met with Expeditors and discussed TGS doing business with Expeditors." (*Id.* at 14.) Roadrunner cites to Peter Schneider's deposition testimony as evidence that the only reason Expeditors did not start doing business with TGS before May 2018 is because Roadrunner filed this lawsuit. (*Id.*) (citing Doc. No. 248 – sealed at 45.) Roadrunner asserts that in "October and November 2017, TGS and Cox spoke with Expeditors about the litigation and Roadrunner's upcoming hearing for preliminary injunction, and they decided to put the new Expeditors business on hold." (*Id.*) Expeditors then started doing business with TGS after allegedly being incorrectly informed that this lawsuit had been dismissed after the court issued its ruling on the preliminary injunction motion. (*Id.* at 25 n.6.)

In its reply, TGS reiterates that Roadrunner's own expert, Mr. Eichmann, excluded Expeditors as a proximate cause for any lost profits on the part of Roadrunner. (Doc. No. 240 at 10.)[6] TGS also emphasizes that in moving for summary judgment it has submitted "declaration

---

[6] Defendant TGS' argument rests heavily on its assertion that Roadrunner's damages expert Richard Eichmann excluded certain companies from his lost profit calculations based on proximate cause grounds. TGS makes this argument regarding many of the contested customers. Rather than address this argument repeatedly, the court will do so here and apply the same reasoning throughout this order. Eichmann stated in his third report that "if profits are lost as a consequence of a voluntary, independent business decision, [Plaintiff] cannot claim [lost profits] even if the Defendant's actions contributed [to that decision]." (Doc. No. 218-7 at 7.) Upon review, the court concludes that Mr. Eichmann did in fact exclude Elk Ridge Almonds, Liberty Transportation, Expeditors, Minturn Nut, and Sierra Valley from his damages calculation, but he did so based only on the *assumption* that those businesses left Roadrunner for reasons unrelated to any alleged wrongdoing on the part of TGS or Cox. Mr. Eichmann excluded clients if they merely "identified a reason other than Mr. Jeffrey Cox as to the reason why they left Roadrunner/Central Cal," but he did not make that factual determination conclusively as a trier of fact would be called upon to do. (*Id.* at 12.) As Mr. Eichmann stated repeatedly in his reports, he "defer[s] to the trier of fact to determine whether these revenues or a subset thereof, were wrongfully obtained by Mr. Cox and/or TGS." (*Id.* at 15; *see also Id.* at 5 ("I ultimately defer to the trier of fact to determine liability with respect to the 13 allegedly affected customers.")) TGS fails to mention that Mr. Eichmann even stated that "[i]f the trier of fact finds liability with respect to all 13 affected customers, the damages . . . are as stated in my original report." (*Id.* at 14.) In that original report, TGS itself admits that Mr. Eichmann "offered his opinions as to all of the damages that Roadrunner had suffered as a result of the alleged conduct of TGS and Mr. Cox,

and deposition testimony from Expeditors' corporate representative confirming Expeditors did not cease doing business with Roadrunner in June of 2017 due to any solicitation on the part of TGS or Cox . . . ." (*Id.*) Lastly, TGS argues that the fact that "TGS and Cox had a meeting with Expeditors in June or July 2017, <u>after</u> Expeditors left Roadrunner, does not constitute evidence that TGS was the cause of Roadrunner losing this customer in June of 2017." (*Id.* at 11.)

Construing the evidence before the court on summary judgment in the light most favorable to the nonmoving party, as it must, the court concludes that Roadrunner has come forward with evidence sufficient to create a triable issue of fact as to the cause of Expeditors' change in where it directed its business. Although TGS has presented evidence that Expeditors ceased doing business with Roadrunner due to performance issues, the court finds that such evidence does not lead to the insurmountable conclusion that Expeditors switched companies for reasons completely unrelated to any actions taken by plaintiff Cox and TGS. For instance, also before the court on summary judgment is evidence that in response to an email asking him which businesses Cox was bringing over to TGS, Tim Schneider listed Expeditors as "coming on board." (Doc. No. 248 at 42 – sealed.) When considered along with the communications and meetings between Expeditors personnel and Cox in July and August, this email constitutes evidence raising a triable issue of material fact. (Doc. No. 248 at 45 – sealed.) Perhaps most importantly, plaintiff Cox's outreach during the summer of 2017 took place during the alleged timeframe covered by the SPA's non-compete provision, which did not end until December 31, 2017. (*Id.*) In contrast to cases in which courts have granted summary judgment based on a lack of evidence of causation, here there is admissible evidence that raises a reasonable dispute as to the issue whether the losses suffered by Roadrunner were caused by TGS. *See, e.g.*, *Lanphere Enters., Inc. v. Jiffy Lube Intl'l Inc.*, 138 Fed. App'x 20, 24 (9th Cir. 2005)[7] (finding the plaintiff

which consisted entirely of lost revenue and profits for the 13 at issue customers." (Doc. No. 238 at 15) (citing Doc. No. 218-6 at 89.) Thus, because the expert testimony merely assumes TGS and Cox did not wrongfully influence the customer decisions, it has no persuasive effect on the court's causation analysis.

[7] Citation to this unpublished Ninth Circuit opinion is appropriate pursuant to Ninth Circuit Rule 36-3(b).

"offered no admissible evidence in support of its claims regarding causation" other than its surveys and expert reports, which were excluded leaving plaintiff's allegations completely unsupported); *Milton H. Greene Archives, Inc. v. CMG Worldwide, Inc.*, No. 05-cv-2200-MMM (MCx), 2008 WL 11334030, at *20 (C.D. Cal. Mar. 17, 2008) (granting summary judgment after excluding declarations that addressed actual loss and concluding that defendant therefore offered *no admissible evidence* of any actual or prospective business relationship that was disrupted by the alleged intentional acts).

Additionally, the fact that Expeditors did not start doing business with TGS until 2018 would not foreclose a jury from finding nonetheless that actions taken during the summer of 2017 qualify as substantial factors that led to TGS taking that business from Roadrunner. *See US Ecology*, 129 Cal. App. 4th at 909. This is particularly so considering that the evidence submitted by Roadrunner on summary judgment suggests that Expeditors only delayed the initiating of its business with TGS because of this pending lawsuit. (Doc. No. 248 at 45 – sealed.) Given the evidence before it, the court cannot state that a reasonable jury could not find causation of damages were Roadrunner to prove liability with respect to its intentional interference with prospective economic advantage. Of course, a rational trier of fact could also reject Roadrunner's interpretation of the evidence and conclude that Expeditors would have left Roadrunner regardless of any actions undertaken by TGS. But this is a determination that a trier of fact must make. Accordingly, the court will deny TGS' motion for summary judgment with regard to the causation of any damages alleged stemming from Expeditors taking its business to TGS and away from Roadrunner.

### 2. Sierra Valley Almonds

Next, TGS argues that Lynn Pardo, the shipping manager of Sierra Valley, testified at deposition that Sierra Valley left Roadrunner "due to its firing of Mr. Cox and service issues that pre-dated his firing." (Doc. No. 238 at 9) (citing Doc. No. 218-4 at 33–34.) TGS also notes that Ms. Pardo has confirmed that she was the one who provided Sierra Valley's rates with Roadrunner to TGS "to make sure they could match them." (*Id.*) (citing Doc. No. 218-4 at 33–34.) TGS further points to evidence that Roadrunner's vice president of sales was concerned

about losing Sierra Valley's business as a result of the firing of plaintiff Cox. (*Id.*) (citing Doc. No. 218-4 at 40.)

In opposition Roadrunner cites to the banker email referenced above, where Tim Schneider responded to an inquiry about what business plaintiff Cox was bringing to TGS by identifying Sierra Valley as a client that would be "on board" with TGS due to plaintiff Cox's hiring. (Doc. No. 240 at 10.) Roadrunner also asserts that "Sierra Valley was one of the Roadrunner customers that Cox and the Schneiders discussed when they met on June 1, 2017, including the load revenue amounts that Roadrunner had been doing for Sierra Valley." (*Id.* at 11.) Roadrunner also cites Tim Schneider's deposition testimony as establishing that plaintiff Cox met with Sierra Valley at least once a month after he joined TGS in July 2017. (*Id.* at 12.) Roadrunner argues that according to Peter Schneider's deposition testimony, Sierra Valley told TGS that they trusted plaintiff Cox to handle their account and "that was one of the reasons why Sierra Valley left Roadrunner and came to TGS." (*Id.* at 12.) Finally, Roadrunner cites their damages expert's report and compares the steep increase in revenues TGS enjoyed from Sierra Valley after plaintiff Cox began working at TGS to the equally steep decrease in Roadrunner's revenues attributable to business with Sierra Valley, with that revenue falling to zero in 2018. (*Id.* at 12.)

In its reply, TGS argues that "Roadrunner presented no declarations or testimony from any Roadrunner employee or customer suggesting that Sierra Valley left Roadrunner due to any alleged solicitation by TGS or Cox." (Doc. No. 239 at 12.) TGS also repeats its previous arguments that neither party's expert concluded that TGS proximately caused Roadrunner's lost profits. (*Id.*)

The court finds that TGS' solicitation argument misses the mark. TGS argues throughout its briefing that the customers at issue did not leave Roadrunner due to any alleged solicitation by plaintiff Cox or TGS. But, in doing so, TGS also concedes that Sierra Valley, as well as many of the other clients discussed below, left Roadrunner because they wanted to work with Cox as a general matter, even if he did not directly solicit their business for TGS. Roadrunner alleges, at least in part, that TGS hired plaintiff Cox in violation of the non-compete clause in the SPA,

1     which inevitably caused customers to leave Roadrunner and take their business to TGS. (Doc No.

2     240 at 25.) The court concludes that it makes little difference whether plaintiff Cox actually

3     solicited these customers, because by hiring him in knowing violation of the SPA, TGS could be

4     found to have caused Roadrunner to lose profits. Accordingly, TGS' argument that Roadrunner

5     offers no evidence of solicitation does not foreclose causation with respect to those customers that

6     left Roadrunner for TGS during the period covered by the non-compete agreement, particularly if

7     those customers explicitly stated they moved their business because they wanted to continue to

8     work with Cox.

9        In any event, the court finds that even the evidence submitted by TGS in moving for

10     summary judgment in its favor establishes questions of material fact as to causation of

11     Roadrunner's damages associated with its loss of Sierra Valley's business. For example, TGS

12     cites to Lynn Pardo's deposition testimony for the proposition that Sierra Valley left Roadrunner

13     due to plaintiff Cox's firing and Roadrunner's prior service issues. However, at deposition, Ms.

14     Pardo responded "yes" to the question "the decision to start looking for a new company to replace

15     Roadrunner, was that made due to any solicitation initiated on behalf of the Schneiders?" (Doc.

16     No. 218-4 at 33.) Ms. Pardo also testified that the ultimate decision to leave Roadrunner and

17     move its business to TGS was based at least in part on loyalty to Cox. (*Id.* at 34.) Tim Schneider

18     also testified at his deposition that Cox "was part of the process" of taking Sierra Valley's

19     business from Roadrunner and bringing it to TGS. (Doc. No. 248 at 43 – sealed.) This

20     testimony, considered along with the email from Schneider to the bank and the circumstantial

21     evidence of the inverse revenue streams and timing of plaintiff Cox's hiring, raises a triable issue

22     of fact as to causation with respect to Roadrunner's claimed damages. *See City of Modesto*, 19

23     Cal. App. 5th at 154 ("'Just as factors such as the magnitude and temporal proximity of the

24     unlawful conduct might evidence or negate the existence of fraud, so too might many of the same

25     factors influence the extent to which an inference of causation is appropriate.'") (quoting *State ex.*

26     *Rel. Wilson v. Superior Court*, 227 Cal. App. 4th 579, 605 (2014)).

27        TGS' motion for summary judgment with regard to the causation of any alleged damages

28     stemming from Roadrunner's loss of Sierra Valley's business will therefore be denied.

14

3.    <u>Netafim</u>

In moving for summary judgment TGS argues that Netafim left Roadrunner due to "unrelated and resolved service-related issues that had been ongoing." (Doc. No. 238 at 9.) According to TGS, Roadrunner's deposition of Netafim's Matthew Reinhardt affirmed this conclusion when Reinhardt testified that absent service-related issues, it's "fair to say" that Netafim's business would still be at Roadrunner. (*Id.* at 9–10.) Based on that evidence, TGS concludes that because Netafim left Roadrunner for reasons completely unrelated to plaintiff Cox, Roadrunner has not submitted sufficient evidence to raise a triable issue of material fact supporting its claim that TGS caused Roadrunner's lost profits associated with Netafim's business. (*Id.*)

In opposition, Roadrunner first contends that "TGS had not done any significant business with Netafim USA . . . in over a year prior to Cox's arrival." (Doc. No. 240 at 12.) Roadrunner next points to Peter Schneider's deposition testimony that "Cox and the Schneiders discussed the revenue and load volume that Netafim was generating for Roadrunner when Cox and the Schneiders met on June 1, 2017." (*Id.*) (citing Doc. No. 248 at 40 – sealed.) Roadrunner points to additional deposition testimony from Schneider that in August 2017, "[he] directed Cox to contact Netafim to get them to move their business to TGS because TGS 'knew Roadrunner did business with them.'" (*Id.*) (citing Doc. No. 248 at 44 – sealed.) The deposition testimony of both Schneider and Reinhardt suggests that plaintiff Cox followed through on that request and reached out to Netafim to obtain their business for TGS. (*Id.*) (citing Doc. No. 248 at 44 – sealed.) Moreover, Roadrunner points to the evidence of Cox's email to Netafim in which he stated: "There has been quite a bit that's happened in our arena and Grace and Ashley and I are all here at TGS now. We wanted to see if you'd be open to talking with us about handling your inbound into Fresno." (*Id.*) Roadrunner also cites to the shift in profits shown in their expert's report, with large gains going to TGS while Roadrunner incurred simultaneous inverse losses, as circumstantial evidence that Cox's breach of the SPA caused both Roadrunner's losses as well as TGS' enrichment. (*Id.*)

/////

In reply, TGS again points to the deposition testimony of Mr. Reinhardt as establishing that Netafim would never have left Roadrunner if service failures had not been occurring, "irrespective of where Mr. Cox and his team were . . . ." (Doc. No. 239 at 12.) TGS also asserts that it did not use confidential information to solicit Netafim; rather, Netafim's corporate representative Mr. Reinhardt provided his rates with Roadrunner to TGS and asked TGS to meet or beat them. (*Id.*) (citing Doc. No. 218-5 at 17.)

According to California courts, a minor force that nonetheless causes harm qualifies as a substantial factor in a causation analysis. *See City of Modesto*, 19 Cal. App. 5th at 156 ("'[T]he substantial factor standard is a relatively broad one, requiring only that the contribution of the individual cause be more than negligible or theoretical.'") (quoting *Bettencourt v. Hennessy Industries, Inc.*, 205 Cal. App. 4th 1103, 1123 (2012)). TGS makes much of the fact that Netafim's representative cited service issues as one of the reasons the company moved its business away from Roadrunner. However, merely because Netafim suggests it would still be a customer of Roadrunner absent those alleged service failures does not mean that TGS and Cox did not act as minor forces that nevertheless played a role in Netafim moving its account in the first place. *See id.* at 156. For example, Cox emailed Reinhardt and solicited him to move his business from Roadrunner to TGS. (Doc. No. 248 at 44 – sealed) ("Do you have anything we can help you with coming up? Almond season is picking up and we should be able to pass on the savings we discussed in our initial meeting."). Additionally, Schneider listed Netafim as a business Cox was bringing to TGS in his email to the bank on September 22, 2017. (Doc. No. 248 at 42 – sealed.) At any rate, the timing of Netafim's transition to TGS aligns with Cox's beginning work at TGS while allegedly in breach of the non-compete provision of the SPA.

Roadrunner has introduced evidence which affords a reasonable basis for a jury to conclude that TGS' conduct was a cause in fact of Roadrunner's lost profits from Netafim. This is all that is required to survive summary judgment. *See City of Modesto*, 19 Cal. App. 5th at 158; *see also Viner v. Sweet*, 30 Cal.4th 1232, 1243 (2003). Based on all of the evidence presented on summary judgment, a reasonable jury could conclude that actions taken by TGS ultimately caused Netafim to move its business from Roadrunner to TGS.

1    Accordingly, TGS' motion for summary judgment with regard to the causation of any

2    alleged damages stemming from Netafim's switch of its business will be denied.

3        4.    Elk Ridge Almonds

4        In arguing that its actions did not cause Roadrunner to lose profits from Elk Ridge

5    Almonds and that it is therefore entitled to summary judgment in its favor as to that aspect of

6    Roadrunner's claims, TGS cites the deposition testimony of Elk Ridge CEO William Pitman.

7    (Doc. No. 238 at 10.)  Pitman testified that "the reason [Roadrunner] no longer has Elk Ridge's

8    business is that Mr. Cox was fired and so is no longer with [Roadrunner]."  (Doc. No. 218-5 at

9    23.)  TGS points out that Pitman also testified that "if Mr. Cox had waited until January 1, 2018

10   to join TGS, [Pitman] would have sent the business to TGS then."  (Doc. No. 238 at 10.)

11   Accordingly, TGS concludes that Roadrunner's damages were caused by its firing of Cox, not by

12   TGS' hiring of him.  (*Id.*)

13       In opposition to the pending motion, Roadrunner contends that the evidence on summary

14   judgment establishes that "Cox and TGS directly communicated with Elk Ridge in 2017 about

15   doing business with TGS."  (Doc. No. 240 at 14.)  In support of this contention, Roadrunner cites

16   to an email Cox wrote to Elk Ridge in August 2017, in which he said, "please let us know what is

17   needed on our side to get going for the upcoming season."  (*Id.* at 14–15) (citing Doc. No. 248 at

18   46 – sealed.)  Roadrunner concludes that a jury could find from this evidence that because Cox

19   was working at TGS in violation of the SPA, "Elk Ridge transitioned its business to TGS."  (*Id.* at

20   15.)

21       In its reply, TGS argues that the only evidence Roadrunner points to in opposing summary

22   judgment "is that Cox and Elkridge communicated after Cox joined TGS and that Elk Ridge

23   transferred its business to TGS."  (Doc. No. 239 at 13.)  TGS also relies on the parties' damages

24   expert reports, which TGS argues conclude that TGS was not the proximate cause of Elk Ridge

25   taking its business from Roadrunner.  (*Id.* at 9–10.)

26       TGS's argument that a company loyal to Cox left Roadrunner because of Cox's

27   termination by Roadrunner and not because of any wrongdoing by Cox or TGS is unavailing on

28   summary judgment.  Cox could not work for a competitor to Roadrunner during the time frame

relevant to this action because of the SPA.  Thus, even if a jury were to conclude that Elk Ridge was merely loyal to Cox and switched its business due to that loyalty alone and nothing else, the jury could still conclude that Elk Ridge would not have left Roadrunner had TGS not hired Cox. Elk Ridge still had shipping needs after Cox was terminated from Roadrunner and the evidence on summary judgment does not establish where it would have sent its business if Cox had remained unemployed by a competitor of Roadrunner.  This basic theory of liability, particularly when taken into consideration with evidence of Cox's outreach to Elk Ridge in August 2017 (*see* Doc. No. 248 at 46 – sealed) raises a triable issue of fact as to whether the alleged conduct undertaken by Cox and TGS played a substantial factor in causing Roadrunner's claimed damages.

Accordingly, TGS' motion for summary judgment with regard to the causation of any alleged damages to Roadrunner stemming from Elk Ridge moving its business to TGS will be denied.

5.    Minturn Nut

TGS has also moved for summary judgment in its favor as to Roadrunner's claims with respect to its loss of Minturn Nut's business, noting that Minturn Nut's shipping manager Susan Vizcarra is plaintiff Cox's aunt by marriage.  (Doc. No. 238 at 8.)  TGS has submitted Ms. Vizcarra's declaration in support of its motion in which she confirms that "upon learning of the firing of Mr. Cox, she immediately 'made the decision to no longer do business with Roadrunner irrespective of what [Mr. Cox] ultimately planned to do next.'"  (*Id.*) (quoting Doc. No. 48-3.)  Moreover, TGS points out that Roadrunner's President Ben Kirkland "testified that '[it] was a given in our mind' that Minturn would leave after Roadrunner fired Mr. Cox."  (*Id.* at 9) (quoting Doc. No. 218-6 at 33.)  TGS also advances the same argument that it raised with respect to Expeditors, namely that the experts for both parties have concluded that TGS was not a proximate cause of damages Roadrunner suffered stemming from Minturn Nut moving its business from Roadrunner to TGS.  (*Id.* at 21.)

In its opposition, Roadrunner contends that Cox met with the Schneiders on June 1, 2017, the day after his termination from Roadrunner, and at that time discussed "the revenue amounts

and load volumes that Minturn had been generating for Roadrunner." (Doc. No. 240 at 11.) Roadrunner asserts that "TGS used the information that Cox provided to TGS to contact Minturn." (*Id.*) Lastly, Roadrunner argues that according to Tim Schneider's deposition testimony, "Cox wanted to bring Minturn to TGS." (*Id.*)

In its reply, TGS argues that "Roadrunner presented no declarations or testimony from any Roadrunner employee or customer suggesting that Minturn left Roadrunner due to any alleged solicitation by TGS or Cox." (Doc. No. 239 at 11.)

The SPA states at § 7.4(a)(i)(B) that through December 31, 2017 plaintiff Cox "may not work for or with . . . any entity. . . that competes with or is planning to compete with Roadrunner in any way . . . ." (Doc. No. 22 at 34.)  TGS has presented evidence on summary judgment that Minturn would have left Roadrunner regardless of any actions undertaken by TGS.  However, it is also the case that Tim Schneider has testified that plaintiff Cox wanted to bring Minturn's business over to TGS (Doc. No. 248 at 42 – sealed), Schneider identified Minturn as a company whose account Cox did bring over to TGS in his email to United Security Bank (Doc. No. 248 at 70 – sealed), and TGS concedes that Cox called on Minturn Nut after joining TGS (Doc. No. 218-6 at 83 n. 185).  Although TGS asserts that Roadrunner's President Ben Kirkland testified that it was a given that Minturn would take its business from Roadrunner, Kirkland in fact testified that Roadrunner's fear was not that Minturn would leave if Cox were fired, "but if he went to work for a *competitor*, there would have been a concern." (Doc. No. 218-6 at 18) (emphasis added). Based on the evidence submitted on summary judgment it remains disputed whether Minturn would have left Roadrunner and taken its business to an undetermined trucking company had Cox not been hired by TGS.  While Vizcarra declared Minturn would have left Roadrunner regardless of where Cox landed, as with Elk Ridge, the timing of if, when, and how Minturn would have switched trucking companies remains an issue for a jury to determine given the evidence Roadrunner has come forward with on summary judgment.

Accordingly, TGS' motion for summary judgment with regard to the cause of any alleged damages stemming from Roadrunner's loss of the Minturn Nut account will be denied.

/////

6.    Liberty Transportation

Regarding the Liberty Transportation account, TGS moves for summary judgment citing the deposition testimony of Elaine Bariteau, the president of Liberty, for the proposition that "Liberty provided its rates with [Roadrunner] to TGS in an effort to see if TGS could beat those rates." (Doc. No. 238 at 11) (citing Doc. No. 218-5 at 32–33.)  TGS next points to the evidence indicating that Liberty initially moved its business from Roadrunner to a company other than TGS and argues that Liberty was simply searching for better rates *generally* and did not leave Roadrunner due to any alleged misconduct on the part of TGS.  (*Id.*)  TGS also includes Liberty in its list of customers that it contends the experts of both parties have excluded from any calculation of Roadrunner's claimed damages.  (*Id.* at 17, 21.)

Roadrunner counters by citing Bariteau's deposition testimony that shortly after Roadrunner fired Cox, he called Liberty and "said he would let Liberty know where he landed." (Doc. No. 240 at 13) (citing Doc. No. 248 at 44 – sealed.)  Roadrunner notes that in July 2017 Cox called Liberty again and said, "I'm at TGS, what do you need?"  (*Id.*)  Roadrunner asserts that this solicitation proved successful since Liberty began using TGS in 2017, where it had previously only utilized the services of Roadrunner.  (*Id.*)  Roadrunner also again cites Schneider's email to the bank, where he identified Liberty Transportation as one of the companies "coming on board" in response to a question about the business plaintiff Cox was bringing to TGS.  (*Id.* at 10, 13) ("[B]y September 2017, Schneider was identifying Liberty as one of the "on board" customers . . . .").

In its reply, TGS advances no new arguments but instead merely asserts that "Roadrunner has failed to meet its burden of producing admissible evidence that would create even a triable issue that Liberty ceased doing business with Roadrunner due to Mr. Cox and/or TGS's alleged conduct."  (Doc. No. 239 at 13.)

According to the evidence submitted on summary judgment, Liberty appears to have sent most of its business to a shipping company titled "Boyajian"[8] and in fact only sent five loads in

---

[8]  The court notes that little more than the name of this company is listed in the evidence submitted by the parties on summary judgment.

August 2017 and eleven loads in October 2017 utilizing TGS. (Doc. Nos. 218-6 at 33; 218-5 at 34) ("'And if I wanted to know the reason why Roadrunner-Central Cal still didn't have Keenan's business, is it fair to say it's because Boyajian offered a price that was much better than Roadrunner and TGS?' 'Yes.'") Nonetheless, evidence of this nature only impacts calculation of the amount of Roadrunner's potential damages. That is, even if TGS only delivered 16 total loads for Liberty in 2017, those 16 loads could still be found by a jury to be damages incurred by Roadrunner as a result of TGS's conduct. Roadrunner has come forward at summary judgment with evidence that Cox called Liberty in July 2017 to tell them that he had joined TGS and that Liberty should keep him in mind if they wanted rates. (Doc. No. 248 at 44 – sealed.) For the same reasons noted above with regard to Elk Ridge, the court concludes that a reasonable jury could consider the evidence currently before the court in light of Cox working in violation of the SPA, and reach the determination that TGS' and Cox's actions caused Roadrunner to lose some amount of Liberty's business.

Accordingly, TGS' motion for summary judgment as to the cause of any alleged damages suffered by Roadrunner stemming from the loss of Liberty Transportation's business will be denied.

7.    National Raisin

In support of its motion for summary judgment as to National Raisin and its business, TGS cites to the deposition of Allison Haeflinger, a National Raisin corporate representative. (Doc. No. 238 at 11.) Haeflinger testified that the reason Roadrunner no longer has National Raisin's business is because "Mr. Cox and his team no longer work at Roadrunner." (*Id.*) (citing Doc. No. 218-5 at 40-41.) TGS points out that Haeflinger also testified that the business National Raisin pulled from Roadrunner after Cox's departure was not sent to TGS. (*Id.*) TGS asserts that only in late 2018 did National Raisin begin sending any work to TGS. (*Id.*) TGS therefore contends that on summary judgment Roadrunner has failed to satisfy its burden of presenting evidence that TGS caused it any lost profits in connection with the National Raisin account.

In opposition, Roadrunner notes that Haeflinger testified that after Cox began working at TGS, he reached out to National Raisin to solicit their business and to "let them know his 'team'

from roadrunner [sic] were with him at TGS." (Doc. No. 240 at 15) (citing Doc. No. 248 – sealed at 46.) Roadrunner does not appear to dispute that National Raisin left Roadrunner because Cox and "his team" moved to TGS. Nor does Roadrunner dispute that National Raisin first moved their business to a trucking company other than TGS. Indeed, Roadrunner asserts that National Raisin was hesitant to work with TGS initially because of past issues, which is why National Raisin first used another company after leaving Roadrunner. (*Id.*) Instead, Roadrunner opposes summary judgment in favor of TGS as to this account on the grounds that there is evidence that National Raisin's decision to later give business to TGS in 2018 resulted from Cox's breach of the SPA in 2017 and therefore TGS remains liable, even if it did not gain National Raisin's business until after the non-compete clause had expired by its terms. (*Id.*)

In reply, TGS merely repeats its original arguments and asserts that Roadrunner has failed to meet its burden on summary judgment. (Doc. No. 239 at 14.)

The evidence submitted by Roadrunner on summary judgment regarding National Raisin is sparse. Nonetheless, Roadrunner has presented Ms. Haeflinger's deposition testimony that Cox both met with and emailed her in July 2017 about moving National Raisin's business from Roadrunner to TGS. (Doc. No. 248 at 46 – sealed.) National Raisin immediately thereafter stopped sending business to Roadrunner. (*Id.*) That same evidence establishes that National Raisin did not move any business to TGS until late 2018. (*Id.*) Moreover, Haeflinger testified that "even if [she] didn't know that Grace and Ashely and Jeff went over [to TGS]" she likely would have moved National Raisin's business because of how TGS handles imports. (Doc. No. 218-5 at 45.) Nevertheless, the question before the court is only whether a disputed issue of material fact exists. Based upon the evidence on summary judgment that Cox solicited National Raisin's business in July 2017 in violation of the SPA, a reasonable jury could conclude that this solicitation substantially factored into National Raisin's initial decision to move its business away from Roadrunner and its later decision in 2018 to send its business to TGS. *See City of Modesto*, 19 Cal. App. 5th at 156 (stating that a minor force that nonetheless causes harm qualifies as a substantial factor).

/////

1    Accordingly, TGS' motion for summary judgment with regard to the causation of any

2    alleged damages stemming from Roadrunner's loss of National Raisin's business will be denied.

3        8.    Hub Group Trucking

4        TGS argues that it is entitled to summary judgment with respect to Roadrunner's claims

5    based upon the alleged loss of Hub's business because "Roadrunner's Rule 30(b)(6) witness, Ben

6    Kirkland, testified that Hub did not move its business from Roadrunner after Mr. Cox was

7    terminated." (Doc. No. 238 at 12) (citing Doc. No. 218-6 at 10–11).[9] In support of this

8    argument, TGS notes that the evidence establishes that "Hub directed considerable revenue to

9    Central Cal over 2016-2018." (*Id.* at 23) (citing Doc. No. 218-7.)

10        In opposition, Roadrunner does not attempt to dispute that it did not lose Hub Group

11    Trucking as a client. Rather, Roadrunner argues that TGS' profits from Hub Group tripled as a

12    result of the SPA breach and that Roadrunner therefore lost some business that would have

13    otherwise gone to it. (Doc. No. 240 at 15.) Roadrunner also asserts that although Kirkland

14    testified that Hub did not move its business, he "was not privy to TGS's records showing a

15    substantial increase in revenues from Hub after Cox joined [] TGS." (Doc. No. 240 at 16 n.4.)

16    Lastly, Roadrunner contends that the temporal proximity between Cox joining TGS and TGS'

17    increased business with Hub Group is evidence from which a jury could reasonably find

18    causation of damages. (*Id.* at 22.)

19        In reply, TGS argues that "Roadrunner presented no declarations or testimony from any

20    Roadrunner employee or customer suggesting that HUB left Roadrunner due to any alleged

21    solicitation by TGS or Cox, because they concede HUB did not." (Doc. No. 239 at 15.) TGS

22    further asserts that "it is unclear exactly how TGS could be said to have 'wrongfully' contacted

23    and solicited business from a customer with whom Roadrunner admits TGS was currently doing

24    business with." (*Id.*)

25        With regard to Hub Group, the court finds TGS' arguments persuasive. Unlike the

26    evidence with respect to the other customers discussed above, Roadrunner has pointed to no

27    ───────────────────────

28    [9] TGS speculates that because of this testimony from its own witness, Roadrunner chose not to
     even depose anyone from the Hub Group during discovery. (Doc. No. 238 at 12.)

evidence suggesting that Cox or TGS solicited business from Hub Group nor to any evidence that the increase in revenue that TGS enjoyed after hiring Cox caused any offsetting lost profits to Roadrunner in connection with services provided to Hub. Rather, it is undisputed that Hub Group was already a customer of TGS's prior to Cox being hired by TGS. (Doc. Nos. 239 at 15, 240 at 15–16.) It is also undisputed that Roadrunner's profits related to business from Hub did not decrease during the time period in question. (Doc. Nos. 239 at 15, 240 at 16 n.4.) Roadrunner claims in conclusory fashion that the increased profits enjoyed by TGS would have gone instead to Roadrunner absent Cox's misconduct, but no evidence before the court on summary judgment supports this assertion. (Doc. No. 240 at 16 n.4.) According to that evidence, TGS's profits associated with Hub's account did increase during the time Cox was in breach of the SPA. However, Roadrunner has simply come forward with no evidence on summary judgment that those increased profits would have otherwise gone to Roadrunner. Without some evidence that Roadrunner would have gained new business from Hub Group during the relevant time period, Roadrunner cannot survive summary judgment with respect to its claim that it was entitled to profits that it never before had earned. *See Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal.4th 1134, 1165–66 (2003) (finding that the plaintiff had satisfied the element of proximate cause on its claim that it would have been awarded a contract but for the alleged interference because plaintiff had shown that the "product was superior and [] its bid was significantly lower than the bid submitted" by the defendant). Here, Roadrunner has simply failed to come forward with any such evidence with regard to new contracts from Hub Group.

Roadrunner argues in the alternative that the court should consider TGS's increased profits when addressing TGS's motion for summary judgment because Roadrunner's third cause of action is for unjust enrichment. (Doc. No. 240 at 25.) Roadrunner appears to be arguing that its unjust enrichment cause of action does not require it to prove any lost profits. But there exists no independent cause of action for unjust enrichment under California law. *See Stewart v. Electrolux Home Products, Inc.*, 1:17-cv-01212-LJO-SKO, 2018 WL 1784273, at *12 (E.D. Cal. April 13, 2018). Rather, the Ninth Circuit held that under California law, unjust enrichment describes "the theory underlying a claim that a defendant has been unjustly conferred a benefit

through mistake, fraud, coercion, or request." *Id.* (citing *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762 (9th Cir. 2015)).  In the wake of the decision in *Astiana*, district courts have construed claims brought as ones for unjust enrichment as quasi-contract causes of action.  *See id.*; *see also Jordan v. Wonderful Citrus Packing LLC*, No. 1:18-cv-00401-AWI-SAB, 2018 WL 4350080, at *3–4 (E.D. Cal. Sept. 10, 2018) ("Quasi-contract in California is a claim for relief that seeks restitution based on the defendant's unjust enrichment.").  For example, one district court has found that "[q]uantum meruit (or quasi contract) 'is an equitable remedy implied by the law under which a plaintiff who has rendered services benefitting the defendant may recover the reasonable value of those services when necessary to prevent unjust enrichment of the defendant.'"  *Swafford v. IBM*, 383 F. Supp. 3d 916, 931 (N.D. Cal. 2019) (quoting *In re De Laurentiis Ent. Grp. Inc.*, 963 F.2d 1269 (9th Cir. 1992)).  Unjust enrichment, at bottom, is an appropriate claim only when a defendant obtained a benefit *from* a plaintiff.  *See Brown v. Wells Fargo Bank, N.A.*, No. 2:19-cv-260-MCE-KJN PS, 2019 WL 3318551, at *8 (E.D. Cal. July 24, 2019) (stating that unjust enrichment is appropriate "where the defendant obtained a benefit from the plaintiff" but the plaintiff does not sue in tort); *see also Astiana*, 783 F.3d at 762 (finding that where the plaintiff had alleged that the defendant, a cosmetics manufacturer, had enticed her and other class members to purchase its products through misleading labeling, thereby unjustly enriching the manufacturer, the plaintiff had stated "a valid quasi-contract claim seeking the remedy of restitution").  Here, the relationship between TGS and Roadrunner cannot be construed as one upon which a quasi-contract claim could be based, nor has Roadrunner meaningfully argued that it is.  Unlike a consumer buying an allegedly defective product or an employee providing services under the impression that they will accrue a reward, Roadrunner did not confer anything to TGS at its own expense.  Roadrunner has failed to articulate any theory under which TGS could be said to have obtained any benefit directly from Roadrunner as to Hub Group and the court thus cannot construe Roadrunner's unjust enrichment claim as a quasi-contract claim.  Therefore, Roadrunner's argument that TGS' increased profits flowing from business with Hub alone raises a triable issue of fact with respect to its damages claim is unpersuasive and must be rejected.

Accordingly, TGS' motion for summary judgment with respect to Roadrunner's claims of having been damaged in connection with its business with Hub Group will be granted.

9.  CAI International

TGS next argues that it is entitled to summary judgment on Roadrunner's claim for damages stemming from its alleged loss of CAI International's business based upon the declaration of CAI's Assistant Vice President Susan Gorre, who declared therein that the "drop in revenue from CAI to Roadrunner Central Cal in 2016/2017 was due to the fact CAI lost the two primary accounts for which we had used Roadrunner/Central Cal for drayage services." (Doc. No. 238 at 12) (citing Doc. No. 218-6 at 24.)[10]

In opposition, Roadrunner argues that the evidence on summary judgment establishes that following Cox's arrival at TGS, CAI began sending business to TGS, even though CAI had only done a few loads with TGS over the five years prior. (Doc. No. 240 at 16.) Roadrunner also relies upon evidence in the form of the Eichmann expert report which shows that during this same time, CAI ceased working with Roadrunner completely. (*Id.*) According to Roadrunner, this evidence and the temporal proximity of the end of CAI work with Roadrunner and the sending of some work to TGS is sufficient to establish a triable issue of fact as to damages it thus incurred and to withstand the pending summary judgment motion. (*Id.* at 22.)

TGS replies that Roadrunner's conclusory argument that its business with CAI ceased while TGS's business with CAI increased does not constitute admissible evidence sufficient to create a triable issue of fact as to whether Roadrunner suffered any damages in the form of loss of business with CAI as a result of the alleged actions of TGS. (Doc. No. 239 at 15.)

Before the court on summary judgment is the declaration of Susan Gorre, the Assistant Vice President for CAI, stating that "in late 2016 CAI lost a piece of business for CAI's customer, Dynacraft, that had represented the primary revenue source for the business between Roadrunner and CAI in 2016." (Doc. No. 218-6 at 24.) Gorre also declared that "in mid-2017 CAI lost a second customer, JF Hillebrand" and that "the drop in revenue from CAI to Roadrunner/Central

---

[10]  Again TGS speculates that Roadrunner elected not to depose anyone from CAI International in light of the contents of the Gorre declaration.

Cal in 2016/2017 was due to the fact CAI lost the two primary accounts for which [they] had used Roadrunner/Central Cal for drayage services." (*Id.*) Gorre's declaration is consistent with Roadrunner's own evidence that CAI "ceased working with Roadrunner, going from $8,000 in the last few months of 2017 to nothing in 2018." (Doc. No. 240 at 16.) Roadrunner has identified no evidence refuting Gorre's declaration and instead relies entirely only on the increased revenue TGS enjoyed from business with CAI, without offering any evidence suggesting any connection between its lost profits and TGS' hiring of Cox. Unlike some of the other customers addressed above, with respect to CAI, Roadrunner has come forward with no evidence on summary judgment from which a reasonable jury could find that CAI ceased sending its business to Roadrunner in order to work with Cox or that Cox's violation of the SPA had *any* impact at all on CAI's business decisions in this regard. Rather, the undisputed evidence before the court establishes that CAI's diminished business with Roadrunner was directly as a result of the loss of the two accounts identified by CAI Assistant Vice President Gorre in her declaration.

Accordingly, TGS' motion for summary judgment with regard to damages allegedly suffered by Roadrunner stemming from its loss of CAI International's business will be granted.

### 10. UPS Supply Chain Solutions

Based upon evidence in the form of the report of its damages expert Monica Ip, TGS argues that in the five months prior to Cox's departure from Roadrunner, Roadrunner had suffered a "74% drop year-over-year" in revenue from UPS and that in the 12 months after Cox joined TGS, TGS' revenues from UPS were next to nothing. (Doc. No. 238 at 12) (citing Doc. No. 218-6 at 35.) TGS thus argues that the evidence on summary judgment establishes that "Roadrunner was well on its way to losing UPS SCS as a customer long before Mr. Cox joined TGS, and that wherever that business went after Mr. Cox joined TGS, it did not go to TGS." (*Id.*) TGS also asserts that Roadrunner has submitted no evidence on summary judgment of contact between plaintiff Cox and UPS after Cox's termination. (*Id.* at 25.) Based upon this undisputed evidence TGS contends it is entitled to summary judgment as to Roadrunner's damages claims stemming from any alleged loss of UPS business.

/////

27

In its opposition, Roadrunner points to Peter Schneider's deposition testimony that UPS called TGS after learning that Cox had been fired by Roadrunner and was now working at TGS. (Doc. No. 240 at 16) (citing Doc. No. 248 at 47.)  Moreover, Roadrunner notes that plaintiff Cox and TGS met with UPS in July 2017.  (*Id.*)  According to Roadrunner, after this meeting and as a as a direct result of plaintiff Cox's solicitation efforts, TGS secured an increase in business from UPS.  (*Id.*)

In reply, TGS repeats that the amount of sales TGS gained from UPS in 2017 pales in comparison to the amount of business Roadrunner lost from UPS prior to Cox's termination. (Doc. No. 239 at 16.)  TGS further contends that the evidence reflects that UPS called and asked TGS for a meeting, and that there is no evidence that TGS engaged in any wrongful solicitation of the UPS business.  (*Id.*)  TGS also argues that even assuming a meeting took place, any meeting between Schneider and the UPS representative was not unusual because "he had met with him roughly once a year for the past 20 years."  (*Id.*)

TGS' argument that it only gained a fraction of the revenue that Roadrunner lost from UPS is unpersuasive on summary judgment for reasons mentioned above with regard to similar arguments.  Roadrunner need only present some evidence from which a reasonable jury could find that TGS caused Roadrunner to lose some profits as a result of its actions in order to defeat summary judgment.

Here, based upon the evidence presented on summary judgment a reasonable jury could determine that UPS would not have initially reached out to TGS had TGS not hired Cox in violation of the non-compete provision in the SPA.  In resolving the pending motion it does not matter who solicited who.  Schneider testified at deposition that Manny Suarez from UPS was one of the first clients to call Cox after his firing and tell him that when Cox landed a new position Suarez wanted to support him.  (Doc. No. 248 at 47 – sealed.)  Schneider also testified that Suarez wanted to and did meet with Cox in July 2017 to discuss TGS taking over some of his

/////

/////

/////

business that had been with Roadrunner, but TGS declined to do so. (*Id.*)[11] This evidence supports Roadrunner's theory of TGS' causation as to the loss of this account.

Accordingly, TGS' motion for summary judgment with regard to alleged damages stemming from Roadrunner's loss of business from UPS Supply Chain Solutions will be denied.

11. <u>Meridian Nut</u>

TGS also seeks summary judgment as to the Meridian Nut account, arguing that the evidence establishes that it maintained a business relationship with Meridian spanning several years, including the time prior to Cox's employment at TGS. (Doc. No. 238 at 13.) TGS again cites to Roadrunner's damages expert, who stated in his second expert report that "Mr. Cox's employment had no influence on the relationship between TGS and Meridian." (*Id.*) (citing Doc. No. 218-6 at 77.) TGS asserts that Roadrunner has produced no evidence of any contact with Meridian after Cox was fired from Roadrunner nor any evidence of damages caused by any conduct allegedly undertaken by TGS. (*Id.*)

In its opposition, Roadrunner cites again to Peter Schneider's deposition testimony that Meridian did almost no business with TGS until TGS hired Cox. (Doc. No. 240 at 16.) Roadrunner also points to the Eichmann damages report as establishing that TGS took on considerable business from Meridian after hiring Cox while Roadrunner lost all of its Meridian Nut business by 2018. (*Id.* at 16–17.)

In reply, TGS argues Roadrunner has presented no new evidence suggesting that Meridian left Roadrunner due to any solicitation by Cox. (Doc. No. 239 at 16–17.) TGS further argues that Roadrunner minimizes the amount of business that TGS did with Meridian before Cox joined TGS. (*Id.*) TGS therefore concludes that Roadrunner has failed to meet its burden of producing admissible evidence that would "create even a triable issue that Meridian Nut ceased doing business with Roadrunner due to Mr. Cox and/or TGS." (*Id.* at 17.)

/////

---

[11]  Despite this testimony that TGS initially declined the request to take over UPS business that had been with Roadrunner, a reasonable jury could infer from Suarez's other statements as reported by Schneider that UPS took its business from Roadrunner to TGS as a result of TGS' hiring of Cox in violation of the SPA.

According to the evidence submitted on summary judgment, after TGS hired Cox, Roadrunner suffered lost profits from Meridian while TGS revenues from Meridian increased over that same time period.  (Doc. No. 218-6 at 77–78.)  It is true that TGS has submitted evidence that Meridian was a prior customer and that any changes in the amount of work performed by TGS with Meridian were attributable to the whims of Meridian's logistics manager.  (*see* Doc. No. 238 at 25.)  Nonetheless, the evidence of Roadrunner's revenues falling and TGS' increasing during Cox's employment with TGS, allegedly in violation of the SPA, is sufficient to create a disputed issue of material fact with regard to the causation of any damages suffered by Roadrunner in this regard.  Additionally, although not specifically cited by Roadrunner, before the court on summary judgment is evidence that on July 25, 2017, Cox messaged Peter and Tim Schneider that TGS was "[g]etting more Meridian loads."  (Doc. No. 218-6 at 77.)  This evidence relating to the time period during the non-compete period supports the conclusion that a reasonable jury could find that the conduct of TGS was a substantial factor in causing Roadrunner's lost profits with respect to its business with Meridian.  *See US Ecology*, 129 Cal. App. 4th at 909.

Accordingly, TGS' motion for summary judgment with regard to Roadrunner's damages claims stemming from Meridian Nut's moving of its business from Roadrunner to TGS will be denied.

**B.      Whether Damages Should Be Limited to the Non-Compete Timeframe As a Matter of Law**

The non-compete provision of the SPA that lies at the heart of this dispute expired on December 31, 2017.  (Doc. No. 22 at 3.)  The parties disagree over whether any alleged damages can accrue past that date.

TGS argues that the court should summarily adjudicate Roadrunner's claim for lost profit damages beyond the end of the non-compete period, barring any recovery of alleged damages accruing after December 31, 2017.  (Doc. No. 238 at 26.)  According to TGS, "[c]ommon sense dictates that the damage to Roadrunner would be any loss of revenue and resulting lost profits during the six-month period that the non-compete remained in effect after TGS hired Mr. Cox."

(*Id.* at 27.)  TGS points out that while its damages expert calculated Roadrunner's purported loss for the nine-month period from July 1, 2017 through the first quarter of 2018, Roadrunner's damages expert calculated the lost profits from July 1, 2017 in perpetuity.  (*Id.* at 27–28.)

Roadrunner opposes TGS' motion for summary judgment on this issue, contending that "it is otherwise well-established that damages under California law can include future lost profits."  (Doc. No. 240 at 28) (citing *Sargon Enter., Inc. v. Univ. of S. Cal.*, 55 Cal. 4th 747, 773-74 (2012)).  In Roadrunner's view, TGS is asking this court to find that had TGS waited six months until January 2018 to hire plaintiff Cox, TGS would have "achieved the same results legitimately, and thus damages must end on [December 31, 2017]."  (*Id.* at 29.)  Roadrunner argues that this argument ignores the fact that the alleged wrongful activity took place during harvest season and that Cox was prohibited from using Roadrunner's confidential information beyond five years.  (*Id.*)  Roadrunner also notes that the parties' damages experts disagree over the proper manner to calculate damages in this case and that "it is for the jury to resolve this dispute and decide the measure and amount of damages, including temporal scope."  (*Id.*)

In reply, TGS argues that "the best case result for Roadrunner is that after Roadrunner fired Mr. Cox with 6 months remaining on the non-compete, TGS and/or Cox are alleged to have obtained a 6 month head start on soliciting these customers."  (Doc. No. 239 at 17.)  In TGS' view, Roadrunner must establish that these customers would have stayed with Roadrunner after January 1, 2018 in order to recover damages accruing after that date.  (*Id.*)  Before going down the path of such future damages at trial, TGS contends that Roadrunner "should be required to make at least a threshold showing of some factual support for that assumption . . . ."  (*Id.* at 18.)

The California Supreme Court has held that "damages for the loss of prospective profits . . . are generally recoverable for the reason that their occurrence and extent may be ascertained with reasonable certainty from the past volume of business and other provable data relevant to the probable future sales."  *Sargon Enter.*, 55 Cal. 4th at 774 (citing *Grupe v. Glick*, 26 Cal. 2d 680, 692 (1945)).  That said, these anticipated profits dependent on future events are allowed only where "their nature and occurrence can be shown by evidence of reasonable reliability."  *Id.*  This constraint serves as the basis of TGS' argument in moving for summary judgment so as to limit

the scope of awardable damages. However, when the fact of *some* future damages is certain, the amount need not be calculated with absolute certainty. *Id.* "This is especially true where . . . it is the wrongful acts of the defendant that have created the difficulty in proving the amount of loss" or "where it is the wrongful acts of the defendant that have caused the other party to not realize a profit to which that party is entitled." *Id.* at 775 (citing *GHK Assocs. v. Mayer Group, Inc.*, 224 Cal. App. 3d 856, 873–74 (1990)).

TGS requests that the court view the evidence on summary judgment and "determine whether there is any triable factual dispute as to whether these customers would have stayed with Roadrunner after January 1, 2018." (Doc. No. 239 at 19.) The court has done so and concludes that the evidence submitted by Roadrunner on summary judgment, and discussed at length above, is sufficient to meet its burden at the summary judgment stage with respect to any claim for future damages. The parties' damages experts have submitted dueling opinions regarding the proper calculus for determining future damages.[12] In light of this dispute, summary judgment is inappropriate with respect to the issue of future damages, if any, available to Roadrunner.

## CONCLUSION

For all of the reasons set forth above:

1.  TGS' motion for summary judgment (Doc. No. 218) is denied as to Roadrunner's damages claims with respect to its alleged loss of business from Minturn Nut Company, Sierra Valley Almonds, Meridian Nut Growers, UPS Supply Chain Solutions, National Raisin Company, Elk Ridge Almonds, Expeditors, Netafim Irrigation, and Liberty Transportation Services;

2.  TGS' motion for summary judgment is granted as to Roadrunner's damages claims with respect to its alleged loss of business from Victor Packing, Hub Group Trucking, CAI International, and Zymex[13]; and

/////

---

[12] Although the experts disagree as to the total damages, both experts agree that damages would accrue past January 1, 2018.

[13] See fn. 5, above.

3.　　TGS' motion for summary judgment is denied to the extent it seeks an order limiting Roadrunner's claim of damages to those accruing beyond December 31, 2017.

IT IS SO ORDERED.

Dated:　__**May 28, 2021**__　　　　　　　　　　_Dale A. Drozd_

UNITED STATES DISTRICT JUDGE